Wright, J.
This action is brought by the plaintiffs to recover the possession of about 150 acres of unimproved wood lands, situated in the town of Gallatin, in the county of Columbia. The lands are in a tract, originally of upwards of 160,000 acres, and known for at least a century past as the manor of Livingston.
The complaint alledges that the plaintiffs are, and have been for many years past, the owners and entitled to the possession of the land described therein; and that being such owners and entitled to the possession of the premises, the defendant, without the leave or license of the plaintiffs, or other legal warrant or authority, entered upon the premises, and claims to be the owner thereof, and unlawfully withholds from the plaintiffs the possession thereof, to their damage. They therefore pray judgment that they may be put in possession of the premises.
The defendant, by his answer, denies that the plaintiffs, at the time of bringing the action, or for many years past, were or-are now the owners of, or entitled to the possession of the premises mentioned and described in the complaint, or any part thereof.
The answer then avers, 1st. That the defendant and those whose title and possession he now holds and has in the premises, were and have been the legal owners in fee of the premises, and *256 every part thereof, and have and had the actual and legal title and possession thereof, adversely in their own right for more than forty years before the bringing of the action, and that no right or title to the premises, or to the possession thereof, accrued to the plaintiffs at any time within the space of forty years before the bringing of the action, nor have the plaintiffs at any time within the space of forty years, received the rents and profits of the premises or any part thereof; by reason whereof, and by force of the statute, the defendant is entitled to hold and enjoy the premises freely against the plaintiffs, and the plaintiffs are barred from recovering the same. 2d. That the plaintiffs were disseised of the premises, and every part thereof, for more than forty years before the bringing of the suit. 3d. That Robert Livingston, jr. the grandfather of the defendant, in his lifetime, was seised in fee and in possession of all that tract of land, situate and lying in the county of Columbia, known as the manor of Livingston, as the same is now bounded on the west by the Hudson river, on the north by the south lines of the towns of Hillsdale, Claverack and Greenport; on the east by the west line of the state of Massachusetts, and on the south in part by the north line of the county of Dutchess, and in part by the Roeliffe Jansen’s creek or kill, and being so seised and possessed, the said Robert Livingston on or about the year 1790, died seised and possessed thereof, having first duly made and executed his last will and testament, bearing date the 31st May, 1784, by which he devised to his four sons, Walter, Robert C., John and Henry, as tenants in common, and to their heirs and assigns, all that portion of the manor of Livingston lying easterly of a certain highway, known as the old post road from the city of Albany to the city of New-York, by virtue of which the said Walter, Robert C., John and Henry, became seised in fee and possessed of all that part of the manor lying east of said road, as tenants in common, and being so seised, Walter Livingston on the 14th April, 1792, released and conveyed to Henry Livingston, his heirs and assigns, his one equal undivided fourth part of said premises, as the same was devised to him; by virtue whereof the said Henry, Robert C. and John became such *257 ownersi in fee, and being such owners, caused and procured the portion of the manor lying east of the post road, to be partitioned and divided into four distinct lots or parcels of land, numbered one, two, three and four, and on the 4th October, 1792, by mutual deeds of conveyance and release executed by and between Robert 0., Henry and John, lot number four, according to said partition, was released, granted and conveyed to John Livingston, the father of defendant, and to his heirs and assigns forever, and John Livingston being so seised in fee, in October, 1792, entered into the possession thereof, and by himself and his servants, agents and tenants, occupied and enjoyed the same in his own right until about the month of October, 1822, when he died seised in fee of said lot number four, having by his last will and testament, bearing date the 19th April, 1822, devised to the defendant in fee, all that portion of great lot No. 4, lying north and west of Roeliff Jansen’s kill or creek, by virtue of which devise the defendant became, and was, and is seised in fee, of, in and to all that part of lot No. 4 lying north and west of Roeliff Jansen’s kill, and being so seised in fee, the defendant entered into the full possession of the same, and by himself, his agents and tenants, has since the decease of the said John Livingston held and still holds the possession of the same, as owner in fee; and that the premises described in the complaint of the plaintiffs are embraced and included in that part of great lot No. 4 lying north and west of Roeliff Jansen’s kill, so as aforesaid devised to the defendant, and is a portion thereof: by reason whereof the defendant claims that he is lawfully entitled to hold the same in fee.
The reply of the plaintiffs denies: 1st. That the defendant and those under whom he claims, have been the legal owners of the premises, or have had the actual or legal title or possession thereof, adversely or otherwise, for more than forty years before the bringing of the action, or that the plaintiffs had no right or title, or had not received the rents or profits of the premises or any part thereof, within forty years before the bringing of this action, or that the defendant is entitled by force of any statute to enjoy the premises against the plaintiffs. 2d. That the plaintiffs have been disseised of the premises, or any part *258 thereof, for forty years before the bringing of the action. 3d. That Robert Livingston, in his lifetime, was seised in fee or in possession of the tract of land described in the answer as the manor of Livingston, or that he died seised or possessed thereof, or that his sons Henry, Robert C,, Walter and John, or any or either of them, became seised or possessed of all that part of said premises in said answer described as the manor of Livingston, lying easterly of the old post road; or that John Livingston at the time alledged in the answer, or ever, became seised in fee, or entered into the possession of, or enjoyed or occupied in his'own right, by his servants, agents or tenants, any part or portion thereof, or that part or portion described in the answer as lot No. 4, or that John Livingston died seised in fee thereof, or of any part thereof, or that the defendant by virtue of any devise of John Livingston or otherwise, became or was, or is seised in fee, or otherwise, of any part or portion of the premises described as the manor of Livingston, or of any part or portion of the part therein described as lot No. 4, or that the defendant has since the death of John Livingston, by himself, his agents or tenants held, or that he now holds, the possession, or any part thereof, of the premises described in the complaint, as owner in fee.
The reply further states that the plaintiffs have not sufficient knowledge to enable them to form a belief, whether Robert Livingston, jr. or John Livingston ever made or executed either of the last wills and testaments alledged in the answer to have been by them respectively made and executed, or whether the deed alledged in the answer to have been executed by Walter Livingston to Henry Livingston, was so made and executed; or whether any portion, or the portion of the lands designated in the answer as the manor of Livingston, lying east of the post road, was ever partitioned or divided into four distinct lots, numbered as in the answer alledged, or otherwise; or whether the premises described in the complaint are included in lot No. 4 of said partition, or whether any deed or deeds of release or conveyance were ever executed by or between Robert C. Livingston, Henry Livingston and. John Livingston, or any or either of them. And they aver that the claim of title made by the de *259 fendant to the premises in the said complaint described, is without foundation, and is not based upon any of the rights in said answer set forth.
By the revolution the people succeeded as owners to all the lands within the limits of the state, that had not prior thereto been legally granted, held or possessed by persons or corporations, or in whom the title had not legally vested. As well by the law of nations, as by a declaratory act of the legislature of this state, passed in 1779, (1 Jones & Varick, 44,) the absolute property of all lands and all right and title to the same, that on the 9th July, 1776, vested in or belonged to the crown of Great Britain, became from that date forever vested in the people of this state, in their sovereign capacity. But with respect to lands that, prior to October, 1775, had been legally granted to individuals by the crown, or to which the title had been legally acquired' by individuals in any other way, neither the revolution, nor the change of the form of government, nor the declaration of the sovereignty of the people, worked any change or forfeiture in the ownership of such property. It is a general principle that the dismemberment of empire, in no instance affects the previous rights of individuals with regard to property. (2 John. Cases, 29.) The constitution of 1846 declares, “ That the people in their right of sovereignty are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the state, and all lands, the title to which shall fail from a defect of heirs, shall revert to or escheat to the people.” (Article 1, § 11.) The people are therefore the owners of all lands within the state that had not prior to, or have not since, the revolution been granted to others; and in their right of sovereignty they are deemed to possess the original and ultimate property in all the lands of the state. Being the source of title they are presumed to be the owners of lands not granted by them, until the contrary appears; and in an action to recover the possession of premises, brought in their name, it is sufficient in the first instance, to entitle them to recover, to show that such premises are vacant, unenclosed and unoccupied. Indeed, in most cases this is the only evidence that can be given. (People *260 v. Wendell, 8 Wend. 188. People v. Dennison, 17 Id. 313. People v. Van Rensselaer, ante, p. 189.)
It appears by the evidence on the part of the plaintiffs, that the premises described in the complaint lie in the town of Gallatin, about three miles from the north line and two miles from the south line of that town, and some five or six miles west of the Uoeliff Jansen’s kill; that at the commencement of this action, and for more than thirty years immediately prior thereto, they were to the knowledge of the witnesses, vacant and unoccupied, being waste, unimproved and uninclosed commons, having on them some timber but no clearing or occupation. This is sufficient in the first instance, and in the absence of other evidence the plaintiffs are entitled to recover.
It is perhaps as well to notice here, although not in the order of the argument of counsel, one of the positions taken by the defendant against the right of the people to recover. It is predicated on the statutes, that have from time to time been passed, in which the people declare that in certain contingencies they will not sue or implead any person for or in respect to any lands, tenements or hereditaments, or the issues or profits thereof. At common law the sovereign can not be disseised. (3 Bl. Com. 237. Com. Dig. Prerogative, D. 6. People v. Arnold, MS. opinion of Mr. Justice Johnson.) Entering on the lands of the sovereign and taking the profits is an intrusion merely. (Jackson v. Winslow, 2 John. 83. Bac. Abr. Prerogative, E. 6. People v. Van Rensselaer, ante, p. 189.) Neither can laches be imputed to sovereignty; and formerly no length of possession would be a defence against the claims of the state, except in certain cases to raise the presumption of a grant. (Co. Litt. 57. Bac. Abr. Prerogative E. D. United States v. White, 2 Hill, 60. Bal. on Limitations, 19. 3 Cruise, 558. Cowper, 214. People v. Van Rensselaer, supra.) This latter rule of the common law has, however, been varied by statutes passed at different periods—one in 1788, some twelve years after the revolution, and others successively in 1801, 1830 and 1848. The limitation in the statutes of 1788.1801 and 1848 is forty years— in that of 1830 twenty years. The statutes are in terms sub *261 stantially similar; they declare that the people will not sue or implead any person in respect to any lands, <fcc. by reason of any right or title of the people to the same, which shall not have accrued within forty years before suit, unless the people, or those under whom they claim, shall have received the rents and profits thereof, or of some part thereof, within the space of forty years; and in every case when such title shall not have accrued as aforesaid, unless such rents and profits shall have been received, the person holding such lands shall freely hold and enjoy the same against the people, and also against all persons claiming by or under them. The policy which dictated these several statutes undoubtedly was, that as, in strictness, lands which might be held adversely as against individuals could not be so held against the people in their sovereign capacity; and as there was no period, by the common law, in which the people might not assert their right, they would, with the view of preserving the peace of society and quieting the title to lands, even as against themselves, declare what should conclude them from suing. Assuming the paper title shown by the defendant to that part of the manor in which the premises in suit are situated, to be defective, still he contends that he has shown such a possession of the particular tract sought to be recovered, as, under the statute, to bar the people. This involves the inquiry as to the character of the possession which shall conclude the state from suing. With regard to the facts there is scarcely any controversy; they are substantially these, as bearing on the question of possession : More than 130 years since, Robert Livingston claimed to own and hold by patent from the British crown a tract of land in what is now the county of Columbia, embracing in the whole about 162,000 acres. He, in his lifetime, exercised acts of ownership over this tract; leased to others small portions thereof; burnt coal in various parts of it, and devised the same to his son Philip Livingston. Philip Livingston claimed the tract under the devise of his father, and exercised acts of ownership and possession over parts of it. After the death of Philip Livingston, his eldest son, Robert Livingston, jun. claimed as heir of his father and under his will to own and hold the tract, leasing a *262 large number of farm lots in it to others, who occupied them. He also lived upon the tract himself, and manufactured iron at a furnace located on a part of it. Robert Livingston, jun. by his will, made in 1784, assumed to devise to his sons, Henry, Walter, John and Robert 0., as tenants in common, all that part of the tract lying east of a certain post road leading from New-York to Albany. After their father’s death, and in 1792, they partitioned and divided the tract into four great lots of from 24,000 to 28,000 acres in each; John Livingston, the father of the defendant, taking in the division great lot No. 4. These lots were numbered from the north line of the tract. They were also divided into farm lots, and at the time of the partition a large number of the farm lots in great lot No. 4 were leased to tenants on leases for lives and for years. John Livingston also resided upon a lot in number four. In 1822, John Livingston assumed to devise to the defendant, that part of No. 4 lying north and west of Roeliff Johnson’s kill, and upon his death the defendant claimed to hold the same under such devise. This portion of the tract is divided into farm lots, and most of them have been or are occupied under leases from the defendant or his ancestors. The premises in suit are located in this part ot the original tract, and have never been enclosed, improved or actually occupied, nor have they been used as a wood lot of the occupant of any known farm, or for the supply of fuel or fencing timber for the purpose of husbandry of such occupant. They lie near the division line of great lots 3 and 4, and are partly surrounded by improved farms, now or heretofore occupied by tenants; they appear to be waste lands or uncultivated commons, open to the road, having on them some timber, but not attached to' any farm or lot occupied by a tenant. The defendant, who resides a number of miles distant from the premises, has taken some timber and firewood from them, and has on three or four occasions within the last 27 years authorized others to cut timber therefrom for building purposes, and cord wood, and wood for burning brick kilns. These are the facts; and the question is whether the defendant shows such a holding or possession of the premises sought to be recovered, that independent *263 of a valid paper title, concludes the people under the statutes. I think not. If the rules respecting adverse possession as between individuals were applicable strictly to the people, still I am of the opinion that the defendant would not bring himself within those rules in respect to the land in suit. There is no pretence that the premises have ever been actually occupied; that there has been “ a substantial enclosure, an actual occupancy, pedis possessio, which was definite, positive and notorious,” continued down under a claim of title for forty years by the defendant and those under whom he claims. (2 John. 234. 10 Id. 477.) Nor do the facts under the provisions of the statute or the decisions of the courts show a constructive adverse possession. (2 R. S. 294. Code, §§ 82, 83. 1 Cowen, 276. 6 Id. 623, 680.) John Livingston, in 1792, was in the occupancy by himself and his tenant of a part of great lot No. 4. He claimed the whole of the lot, consisting of about 24,000 acres, founding such claim upon a written instrument. The defendant succeeds to him, and claims all that part of great lot No. 4 lying north and west of Roeliff Johnson’s kill, embracing some 10,000 or 12,000 acres, and occupied by himself and his tenants, distinct farms and lots in such tract. The tract is divided into lots. The lot in suit has not been actually cultivated or improved or protected by a substantial enclosure, nor has it been used for the supply of fuel or of fencing timber, for the purpose of husbandry or the ordinary use of the defendant, or those under whom he claims, or any one occupying lands under him as tenants; nor is it a portion of a known farm or single lot partly improved that has been left not cleared or not enclosed according to the usual course and custom of the adjoining country. Now were this a case in which a constructive adverse possession might be shown, although it might appear that the defendant, or those under whom he claims, entered into the possession of great lot four, under claim of title, founding such claim upon a written instrument, and that there has been a continued occupation and possession of parts of such tract, it being divided into lots, and the lot in suit not having been usually cultivated or improved, or protected by a substantial enclosure, or used for the supply of
*264 fuel or fencing timber for the purposes of husbandry, or the ordinary use of the defendant, or those under whom he claims, or any of his tenants, and not being a portion of a known farm or single lot partly improved that has been left not cleared, or not enclosed according to the usual course and custom of the adjoining country; the possession of some of the lots in the tract claimed, is not constructively to be deemed a possession of the lot or tract in suit. If, therefore, the facts would not establish an adverse possession as between individuals, it will scarcely be pretended that the people should be concluded, against whom no rights can properly be acquired by adverse holding, and who in their sovereign capacity are not controlled or affected, or their rights made to depend upon any question of constructive possession, unsupported by a valid grant; but that which the statute requires, is, I think, an actual continued possession for forty years prior to the bringing of the action. If there has been an actual occupancy for that period of time, and no receipt of rents and profits by the people or those under whom they claim, nor right or title asserted, the occupant, though the premises may never have been legally granted, shall freely hold and enjoy them against the people. The promise of the sovereign is that he will not sue or implead him for or in respect to lands thus - occupied. (Clinton v. Haring, 1 Murphy, 414. Peoples v. Wendell, 8 Wend. 183. People v. Van Rensselaer, supra.) Our statutes (either of 1788 or 1801) are substantially like that of 9 Geo. 3d, ch. 16, called the nullum tempus act. Under that act an actual possession of sixty years is deemed necessary to bar the king. (3 Bl. Com. 307. 11 East, 495. Adams on Eject. 78.)
The lands for which the suit is brought being; ht and unoccupied at the time of bringing the actior , aught that appears never having been actually occupied defendant or those under whom he claims, or at least, .ui for forty years continuously, prior to the action being brought, the case (assuming that there is no valid grant to the defendant or those under whom he claims) is not controlled by the statutes declaring the contingencies upon which the sovereign will not sue or implead individuals for or in respect to lands, or the issues and *265 profits thereof. All that the facts show in relation to the premises sought to be recovered, are the exercise of acts of ownership over them occasionally by the defendant, and those under whom he claims, and that kind of possession which the law presumes to accompany and be in subordination to the legal title. Without that title the possession shown, of itself, constitutes no bar to the bringing of the action.1 All the cases that I have had an opportunity of examining, place the bar upon the actual possession of the defendant, or those under whom he claims.
The plaintiffs having rested, the defendant with the view of showing title in himself to the premises, or at least of showing title out of the state, introduced 1st. Letters patent from Thomas Dongan, Lieut. Governor, under James 2d, of the province of New-York, bearing date the 22d July, 1686, to Robert Livingston. The patent is signed by Dongan, and purports to be sealed with the seal of the province. It recites two prior grants made by the government, and purports to comprehend them in general natural boundaries, described by Indian names: recites that Livingston had been at vast charge and expense in purchasing the tracts and parcels of land from the native Indians, and also in settling and improving the same, and that for encouraging the future settlement he had made application to Dongan that he would constitute and erect the tracts of land comprehended within the general described boundaries, into a lordship or manor. It then proceeds to give, grant, ratify, release and confirm unto Livingston, his heirs and assigns, all the tract and parcel of land, lying and being within the general limits sind boundaries recited, and to erect and constitute the same into a lordship or manor, to be called the lordship and manor of Livingston, giving it a court leet and court baron and other privileges: and reserving to the king the annual quit rent of twenty-eight shillings. On the back of the patent is indorsed the following words and figures: “ May it please your Honor, the Att’y General hath perused this patent and finds nothing contained therein prejudicial to his majesty’s interests. Examined July 8,1686. J. A. Graham. Recorded in the secretary’s office for the province of New-York, in Lib. No. 1, began 1684, *266 pages 491 to 498, per T. Spragg, Seer.” Graham was attorney general of the province and supervisor of patents, and Spragg secretary of the council, during Dongan’s administration. The evidence leaves no doubt that the lands granted by the patent, and included in general boundaries described by Indian names, are the same that are bounded in a patent issued in 1715, by monuments, courses and distances, and that the tract has, since the issuing of the patent of 1686, been known and called by the name of the manor of Livingston, 2d. Letters patent from George I. to Robert Livingston, dated 1st Oct. 1715, and issued by Robert Hunter, governor of the province of New-Y ork. The seal of the province of New-York is attached to this patent and it is signed as follows; “ By order of his Excellency J. S. Will-man, D. Secretary.” On the back is indorsed the following: “ Recorded in the secretary’s office of the province of New-Y ork, in the book of patents began A. D. 1711, in fol. 113 to 127, comp’d and examined pr. J. S. Willman, D. Secretary.” The patent recites two prior grants to Livingston in 1684 and 1685; also that upon further application made by Livingston to Col. Thomas Dongan, lieut. governor of the province of New-York, setting forth and making it appear that he had been at vast charge and expense in purchasing the said tracts of land and other land adjoining to the aforesaid two several tracts or parcels of land, the whole comprehended by general boundaries, and praying the grant and confirmation of the same, and that the same might be erected into one manor, a third patent was issued by Dongan, dated 22d July, 1686, giving, granting, releasing and confirming unto Livingston and his heirs and assigns, all the lands comprehended in the general boundaries, and erecting the same into a lordship or manor, by the name of Livingston, reserving to the king the yearly rent of twenty-eight shillings; that by the petition of Livingston presented to Robert Hunter, governor of the province, he had prayed to have a patent of confirmation of the soil and grounds within the limits and bounds of the said manor of Livingston, and of all the privileges, powers and authorities granted unto him, together with the full liberty and privilege to the freeholders inhabiting the manor, to *267 elect, choose, and send one fit person, being a freeholder, to be their representative, to serve in the general assembly of the province of New-Y01‘k, and to choose collectors and constables; also to amend any of the Indian names mentioned in the said patents, when they are misspelled, and to make the lands and bounds of the said tract of land and manor more perfect and particular by adding to the natural boundaries, the courses and distances of the several lines comprehending, with the Hudson river, the whole of the said manor of Livingston. It then proceeds to give, grant, ratify, release and confirm unto Livingston, his heirs and assigns forever, all the land and premises within the limits and bounds of the manor of Livingston, (those limits and bounds being described by natural boundaries, and the courses and distances of the several lines by actual survey,) excepting and reserving unto the king and his successors, 6000 acres of the soil or ground part of the said manor, formerly by indentures of bargain and sale, bearing date 29th September, in the ninth year of the reign of Q,ueen Anne, for a valuable consideration, purchased from the said Robert Livingston, for the proper use of her majesty, her heirs and successors for -ever, and excepting also, all silver and gold mines. It also grants the power of choosing a representative to the general assembly of the province, and collectors and constables for the manor j and provides that the letters patent and the record of them shall be good and effectual in the law, to all intents, constructions and purposes notwithstanding the not true, and well reciting and mentioning of the premises, or any part thereof, or of the misspelling of any word in the naming of the limits and bounds thereof, and of any former or other letters patent, or grants for the same or any parts thereof, made and granted by King George I. or any of his royal ancestors to any other person or persons, body politic or corporate, or any law or other restraint, uncertainty or imperfection whatever, to the contrary thereof notwithstanding. The annual quit rent of twenty-eight shillings is reserved to the crown.
3rd. Will of Robert Livingston, dated 10th Feb. 1722, devising that part of the manor of Livingston, now called the lower manor (town of Clermont) to his son Robert, and all the residue *268 of the manor to his eldest son Philip, and to the heirs of his body lawfully begotten, in fee tail.
4th. Will of Philip Livingston, dated 15th July, 1748, devising to his eldest son Robert Livingston, jun. all the lands, tenements and hereditaments within the manor of Livingston, devised to him by his father, and to the heirs of his body lawfully begotten, in fee tail.
5 th. Exemplification of a common recovery to bar or dock the entail, suffered of the manor of Livingston in Oct. term, 1771.
6th. Will of Robert Livingston, jun. dated 31st May, 1784, and proved 8th Dec. 1790, before the surrogate of the county of Columbia, devising all the lands of the manor lying east of the post road leading from Albany to New-York, to the testator’s sons, Robert C., Henry, Walter and John, as tenants in common.
7th. Deed from Walter Livingston to Henry Livingston, dated 14th April, 1792, conveying all his interest in the manor derived under the will of his father, Robert Livingston, jun.
8th. Deed of partition between Robert C. Livingston, Henry Livingston and John Livingston, dated 4th October, 1792, with the map annexed, acknowledged the same day before Robert Yates, chief justice of the supreme court. The deed recites the partition and division of that part of the manor lying east of the post road into four lots, numbered one, two, three and four, and releases to John Livingston lot No. 4.
9 th. Will of John Livingston, dated 19th April, 1822, proved as a will of personal estate on the 30th October, 1822, and of real estate on the 9th September, 1839, devising to the defendant that part of lot No. 4 lying north and west of Roeliff Johnson’s kill, on condition that the testator’s brother Henry should devise to the testator’s son Henry what would be equal to a moiety of lot No. 3.
10th. Will of Henry Livingston (brother of John) dated 21st March, 1823, and proved as a will of real estate on the 25th of September, 1832. This will devises to Henry, son of John Livingston, a moiety of lot No. 3.
Accompanying the paper title the defendant introduced the survey and map of John Beaty, deputy surveyor, made in 1714, *269 of the manor of Livingston, and which is the same described and incorporated in the patent of 1715; also the diary kept when making such survey, in the hand-writing of Robert Livingston. He also introduced various acts of the colonial and state legislatures referring to and recognizing the existence of the manor of Livingston, and maps of two or three towns erected from it. It was shown that in 1710, Robert Hunter, then the governor of the province of New-York, purchased from Livingston 6000 acres, parcel of the manor, for the use of Queen Anne and her successors. This land was settled by German Palatines sent out by the queen. Robert Livingston, the original proprietor, entered upon the manor and exercised acts of ownership over it; a mansion house was erected upon it somewhere about the year 1698, and he leased several farms and lots to tenants. The manor was represented in the general assembly of the province of New-York for many years after 1715. Philip Livingston succeeded his father, exercising acts of ownership and possession over that part of the manor devised to him. A furnace was erected in that part now called An cram, and iron in considerable quantities manufactured. Robert Livingston, jun. lived upon the manor for about forty years, and leased to others many farms and lots in various parts—inasmuch that when John Livingston, his son, in 1792, entered upon great lot No. 4, under the devise in the will of his father, and after the partition by himself and his brothers, a large proportion of said lot was actually occupied. John Livingston by himself and his tenants actually occupied a considerable part of lot No. 4, until his death in 1822, and since his death his son, the defendant, under the devise in his father’s will, has claimed to own all that part of lot No. 4 lying north and west of Roeliff Johnson’s kill, and within the limits and bounds of which are the premises sought to be recovered.
In August, 1765, Robert Livingston, jun. paid to the colonial government the quit rent in full up to March, 1765, reserved in the patent of October, 1715; and in December, 1788, he paid to the state government the rent reserved by the same patent up to September, 1787, and also the sum of £19.12, as a comma *270 tation of the rent so reserved. On Sauthier’s map of the province of New-York, a copy of which is now in the office of the secretary of state, and which purports to have been compiled from actual surveys on file in the patent office of the province, by order of Governor Tryon, the manor of Livingston is laid down in accordance with Beaty’s survey and the patent of 1715, and substantially as it has been claimed by the defendant and his ancestors.
After the defendant had closed his evidence in relation to title, the plaintiffs introduced—
1st. Exemplification of the record of a commission dated 10th June, 1686, from James II. king of Great Britain, to Thos. Dongan. This commission appoints Dongan captain general and governor in chief in and over the province of New-York, Amongst other and plenary grants of power and authority contained therein, is the following: “ And we do likewise give and grant unto you full power and authority, by and with the advice and consent of our said council, to agree with the planters and inhabitants of our province and territories aforesaid, concerning such lands, tenements and hereditaments as now are or hereafter shall be in our power to dispose of, and them to grant to any person or persons for such term and under such moderate quit rents, services and acknowledgments to be thereupon reserved unto us as you, by and with the advice aforesaid, shall think fit; which said grants are to pass and be sealed by our seal of .New-York, and being entered upon record by such officer or officers as you shall appoint thereunto, shall be good and effectual in law against us, our heirs and successors.”
2d. Exemplification of the record of a commission dated 19th October, in the eighth jrear of the reign of Queen Anne, (1709-10,) 'from Queen Anne to Robert Hunter. It appoints Hunter governor of the province of New-York, and gives and grants to him plenary power and authority to act as such. The power and authority to grant lands is in the precise words above recited from Dongan’s commission.
3d. Exemplification of the record of a commission dated 17th March, in the first year of the reign of George I. (1714,) from *271 George I. king of Great Britain, to Robert Hunter. It appoints and gives and grants to Hunter power and authority to act as governor. The power and authority to grant lands are in the words above recited from Dongan’s commission.
4th. Exemplification of the record of a commission dated 30th September, 1682, from James Duke of York, to Thomas Dongan. The commission recites a grant of land, including the province of New-York, to the duke of York, from his brother the king of Great Britain, with the power to govern the same by himself, his deputies, commissioners or officers, and then appoints Col. Thomas Dongan as his lieutenant and governor of the province of New-York, during his will and pleasure to perform and execute all and every the powers which the duke of York, by himself, his deputies, agent or assigns, might execute under the letters patent issued to him from his brother the king of Great Britain.
5th. Exemplification of an extract from the minutes of council, as found in book of Council Minutes No. 5, at page 60, in the office of the secretary of state. It is as follows: “At a council held in Fort James, in New-York, March 22d, 1683, present the governor, &c.—Ordered; That whoever buys land from the Indians the purchase shall be made before the governor in council, and that bargain recorded; and all above Esopus are to be made before the magistrates of Esopus or Albany, at the place nearest to the purchasers, and there recorded; and the purchase to be surveyed, and the survey and record of purchase is to be returned into the secretary’s office. In the survey the quantity of land is to be expressed and how much meadow and cleared land.”
6th. Letters patent from Thomas Dongan, lieutenant governor under James duke of York, to Robert Livingston, dated 4th November, 1684, This patent grants to Livingston, and his heirs and assigns, “ a certain tract or parcel of land, lying and being on a creek, on the east side of Hudson river, commonly called or known by the name of Roeliff Johnson’s kill, it being in three plains called Nekawkook, Nuhpa, Wuhquaskaka, and two or three other small flats or plains, containing in all *272 about one hundred morgan, or two hundred acres, together with eighteen hundred acres of woodland, lying and being between a small creek or kill, lying over against Catskill, called Wackanekcisseck, and a place by the indians called Swaskahampka to the south of Roeliff Johnson’s kill; that is to say, two hundred acres along the river side, and the rest adjoining to the said two hundred acres and so running back into the woods.” The rent, reserved to the duke of York by this patent, was twenty shillings per annum. It is one of the grants recited in the patents of 1686 and 1715.
7th. Letters patent from Thomas Dongan, lieutenant governor, and vice admiral of New-York, under James 2d, king of Great Britain, dated 27th August, 1685, to Robert Livingston. This patent grants to Livingston and his heirs and assigns “ a certain tract and parcel of land called Taghkanic, lying.and being within the province of New-York, beginning behind Patkook on a certain creek that runs into the east side of Hudson’s river, and then known by the name of Roeliff Johnson’s kill, beginning on the northwest side of said kill, that runs along the flat or plain land, at a place called by the natives Minisichtanock, where two black oak trees are marked with L, from thence along a small hill to a valley that leads to a small creek, called by the indians Qnissickook, and over the said creek to a high place to the westward of a high mountain, where two black oak trees are marked L, and' is called by the natives Kachkawagick; from thence westward to a small hill on the side of a creek, called Skaanpook, where two white oak trees are marked L, and so runs along the east side of said creek, which a little lower is called by the name of Twastewekack, and is the westerly bounds; the tract lying to the eastward of the creek, called the Twastawekack, the southerly bounds beginning on the other side of the creek that runs along the flat or plain over against Minissictanock, where two trees are marked, and runs along the foot of the high mountains to the path that goes to Wanijachtanook, tó a hill called by the indians Mannanosick, where two trees are marked L on the southwest side of the path, from thence westward to a creek called by the natives Nachawawack *273 kano, where two white oak trees are marked L, which creek comes into the other creek called Twastawekack, which is the west bounds: the place where the said two creeks meet being called Wawecknack, the flat or plain lying on both sides of said creek, containing about three hundred morgan or six hundred acres.” The rent reserved to the king by this patent is eight shillings per annum. It is one of the grants recited in the patents of 1686 and 1715.
8th. Original petition of Robert Livingston to Gov. Dongan for a license to purchase from the Indians “ a piece of land lying upon Roeliff Johnson’s kill, called by the indians Taghkanic behind Patkook, about 200 or 300 acres on the back of this petition is indorsed, in the hand-writing of Spragg, who was secretary of the council, the following: “ This petition being read July 3d, 1685, for 200 acres of the said land, was granted,
. provided it be not disposed of to any others, and that a survey be made and sent into the secretary’s office, and the purchase be made before the magistrate of Albany, and the patent be taken out before the last day of September next; otherwise this license to be void.” This order is also entered in the book in the office of the secretary of state, purporting to be the minutes of council.
9th. The original petition of Robert Livingston to Gov. An-dross, dated 12th November, 1680. This petition sets forth that there is a certain tract of land lying on Roeliff Johnson’s kill, upon the east side of Hudson’s river, near Catskill, belonging to the iridian proprietors, and not purchased by any body hitherto, and that the owners are willing to dispose of the same. The petition requests his excellency’s grant to purchase the same of the proprietors, upon satisfying them to their content, and producing a return thereof from the court of Albany, and expresses the hope that the governor will then be pleased to grant a patent "accordingly.
In addition to the documentary evidence on the part of the plaintiffs, James Redfield, (a clerk in the office of the secretary of state,) testified: that he had examined books in that office purporting to be minutes of the colonial council, but whether *274 they are original minutes or copies.he is unable to say. There are'from 8 to 10 volumes of them. There appears to be no record from 1678 to 1681: with that exception they are continuous from 1677 to 1750. Found Livingston’s name but once mentioned on these minutes in connection .with the conveyance of lands; that was in 1685. There is no entry in these minutes of council in reference to granting a patent to him in 1686 or 1715. Also examined books and records belonging to the office now at the bindery. With the exception of this petition and another, and the extracts from the minutes of council, the witness found nothing else in the secretary’s office, in relation to lands to be granted to Livingston, between 1667 and 1750, except the record of patents. He also examined the surveys in the office of the secretary of state, from 1681; found surveys in the office from 1681, preserved in files by years; he examined carefully from 1681 to 1750, to see if there was any warrant of survey, or any return of survey for Livingston. He found none; he searched also in the office of the secretary of state for indian deeds, to Livingston. Examined all the deeds up to 1730 or 1740—found no indian deeds to Livingston. On his cross-examination he testified that he had not examined the books and papers that were deposited in a room under the comptroller’s charge, when brought from the old state hall. He has no doubt that papers have been lost connected with the colonial government.
Dr. Edward O’Callaghan, (editor of the Documentary History of New-York,) also a witness called on the part of the plaintiffs, testified that he had been engaged in the secretary’s department since 1848; that he had made search for proceedings of council in Andross and Dongan’s time in relation to the grant of lands to Livingston. He only found in that part of the office under his control, what Redfield testified to in the book of council minutes, and a loose petition. There are a bundle of papers in the office respecting the dispute between Massachusetts and New-York, concerning the boundary line and encroachments on what is called the manor of Livingston. The petition (above recited) is to Dongan, and is in the hand-writing of Livingston, *275 as he believes from his knowledge of his hand-writing as it appears in the public records. The order disposing of this petition is in the hand-writing of Spragg, who was secretary of the council. Livingston was clerk of the county of Albany. He had made search in the office of the clerk of the county of Albany, for deeds from the indians to Robert Livingston from 1675 to 1712—he had brought with him all he could find. The book which he holds in his hands is a book of records in county clerk’s office, marked “ Deed Book 0,” from 1678 to 1687. The first record in it is an agreement dated 12th July, 1683, between certain indians and Livingston, to sell to Livingston all their right to certain lands extending along the bank of the river, northwards from Roeliff Jansen’s kill to a small stream opposite Catskill, named Wackanekassick, and southwards down the river opposite the Saugerties kill to a place called by the indians Saskahampka, and further eastward in towards the woods, keeping the same breadth as on the river bank, to a cripple bush by the indians called Wahaskakook, the same consisting of three flats with four small flats, together with the woodlands, kills and creeks. The next record is a deed dated 15th July, 1683, for the tract described in the agreement. The next record is a deed dated 10th August, 1685, from certain indians for the tract called Taghkanic, (the description in the deed is substantially the same as that in the patent of 1685,) the date of the last record in this book is the 15th April, 1785; the last deed consecutively is the 11th March, 1687, old style. The witness examined the next volume of records with the view of finding an indian deed in that book to Livingston. He found none.
HamiltonW. Robinson, (one of the counsel for the plaintiffs,) testified that he had searched the office of the clerk of Albany county, for indian deeds to Livingston; he searched from 1670 to 1715. He found no deeds, except the two that have been mentioned.
Upon the defendant’s offering in evidence the patents of 1686 and 1715, the counsel for the people objected to their being read, on various grounds, amongst which was the ground that they *276 are not specifically averred and set forth in the answer of the defendant. This objection I deem not well taken. The answer avers the fact that Robert Livingston, jr. the grandfather of the defendant, was, in his lifetime, seised in fee and in possession of the manor of Livingston. This is a sufficient averment of the fact of title in him. It is not necessary that the evidence of such fact should be set forth in the pleadings: the other objections of the plaintiffs will be noticed hereafter. Most of the documentary evidence on both sides, relating to the title, was specifically objected to and received subject to objection.
It can not be doubted if either the patent of 1686 or that of 1715, is valid, (as the premises in suit are included in either grant,) the plaintiffs can not recover. This is virtually conceded by their counsel.
The titles to land in the province of New-York, prior to the revolution, originated (with the exception of some Dutch grants,) from the crown of Great Britain. In 1663, Charles II. granted the province by letters patent to his brother, James duke of York. Prior to this grant the Dutch West India Company had seized it, made settlements and issued many grants of land. In August, 1664, the country was surrendered by the Dutch to the English. In June, 1674, the duke of York obtained a new grant from the king of all the territories included in the former letters patent in 1663. During the life of Charles II. the duke of York, as proprietor of the soil, passed grants in fee, by his governors, and after his accession to the throne grants continued to issue under the seal of the province, in consequence of the powers given to the several governors by their commissions and instructions from the crown. It is said that only two instances occur of grants or letters patent for lands under the great seal of Great Britain. All the title to lands in fee, therefore, in the province prior to the revolution, except old Dutch grants unconfirmed, originated from the crown of Great Britain, either mediately through the duke of York before his accession to the throne, or immediately by grants under the great seal of Great Britain, or of the province. (Gov. Tryon’s Rep. vol. 1. Doc. Hist. of New- York, 749, 750.) The courts of this state recognize no *277 other title acquired prior to the revolution. (Jackson v. Ingraham, 4 John. 181. Jackson v. Waters, 12 Id. 366. La Frombois v. Jackson, 8 Cowen, 604.) A grant from the crown is not void because the Indian title has not been extinguished. (Jackson v. Hudson, 3 John. 383. 6 Cranch, 87.) In the province the indian possession was not considered a source of title ; (Doc. Hist. of N. Y. 751;) and Kent, Ch. J. in Jackson v. Hudson, says “ the question of the indian possession and tille-is, or- was a political question between the government and them.” The constitution of this state avoids all grants of land made by the king of Great Britain, or persons acting under his authority, after the 14th October, 1775, but provides that nothing contained therein shall affect any grants of land within the state, made by the authority of such king, or his predecessors, by him or them made before that day. The defendant offers as evidence of his title two grants purporting to have been made by the British crown, and to have passed the seal of the province. If they, or either of them, passed to the defendant’s ancestors the title of the crown to the lands which thejr purported to grant, that, it is not denied, puts an end to this controversy. It is not pretended that prior to the revolution, they- reverted to the British crown, or subsequently thereto to the people, by forfeiture, escheat or otherwise. What is pretended is, that they are invalid instruments passing nothing to the grantee—that the title remained in the crown of Great Britain up to the revolution, and was then acquired by the people of this state in their sovereign capacity.
I am of the opinion that the patents of 1686 and 1715 are to be regarded as distinct, independent grants, the one not dependent upon the other, nor either upon a former grant, to give it efficacy. I shall therefore consider the objections taken to them singly. These objections may be, as regards both patents, generally classed under three heads. 1st. That the patents were issued without authority; 2d. That they were irregularly issued ; 3d. That they were fraudulently procured by the grantee.
If letters patent are absolutely void on their face, or the issuing of them was without authority, or was prohibited by statute, or the state had no title, the decisions of the courts very uni *278 formly agree that they may be impeached collaterally in a court of law in an action of ejectment. (10 John. 23. 12 Id. 81. 9 Cranch, 87. 11 Wheat. 384.) If there is nothing upon the face of the instrument rendering it absolutely void, it is of itself prima facie evidence that it was regularly issued, and that all things preliminary had been performed or complied with. (People v. Mauran, 5 Denio, 389.)
In Boardman v. Peck, (6 Pet. 342,) it was said “ That when an individual claims land under a tax sale, he must show that the substantial requisites of the law have been observed; but this is never necessary when the claim rests on a patent from the commonwealth. In the Arredondo case, (6 Peters, 727,) which was decided in the supreme court of the United States, and which involved the validity of the grant of a large tract of land made by á Spanish governor, prior to the cession of Florida to the United States, it was said with great force, that “ the public acts of public officers, purporting to be executed in an official capacity, and by public authority, shall not be presumed to be an usurped, but a legitimate authority, previously given, or subsequently ratified. If it was not a legal presumption, that public and responsible officers, claiming and exercising the right of disposing of the public domain, did it by the order and consent of the government in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite in this country.”
The patent of 1686 is of crown lands. The issuing of it was not prohibited by statute, and the crown had title to the land granted. It runs in the name of Dongan, lieut. gov. and vice admiral of the province of New-York, under James II. and purports to grant by virtue of authority to him derived from the king. It purports to be sealed with the seal of the province, to have been examined by the attorney general, and to have received his certificate that he finds nothing therein prejudicial to his majesty’s interests. It was also, at the date of its issue, entered of record in the book of patents in the secretary’s office of the province.
It is urged that it is void for the reason that it is a patent *279 from the lieutenant governor, and not from the crown. As has been remarked, it runs in the name of the governor, but it is nevertheless a crown grant, and of the government domain, purporting to be issued under seal of the province, by virtue of authority conferred by the king, and reserving to the crown an annual quit rent. It is also urged that it is not sealed with the seal of the province; that the seal is the ducal and not the royal seal. There is no evidence of the particular character or description óf-the seal of the province in 1686. As the duke of York had succeeded to the crown the year previously, it is probable that the seal of the province in 1686, had not yet been changed. It can make no difference however, whether the seal was that of the- province during the proprietorship of James duke of York, or not, provided it was and continued to be the seal of the province after he ascended the throne, and at the date of the patent in 1686. Whether it bore the ducal or royal arms or effigy, the only question is, was it in fact, at the date of the patent, the seal of the province: and this question we can only solve by the patent itself. Therein it is stated to be the seal of the province.
A further objection is that the lieutenant governor had no authority to grant, except in cases where the advice and consent of the council were given, and where rents were reserved; that with respect to this grant the council did not authorize, advise or consent, and no quit rents were reserved. The issuing of the patent was a public act of a public officer, and purports to have been exercised in an official capacity, and by public authority. The legal presumption is, in the absence of affirmative proof to the contrary, that it was done by the order and consent of the government. That the authority was previously given or subsequently ratified. If the governor of a conquered province has jurisdiction, by his instructions from the king, or the local laws and usages of the colony, over a particular subject matter, all acts done in its exercise are valid; if there is an abuse of discretion conferred, such abuse is a matter between the governor and his government. (6 Peters, 729.) Were there no evidence in the case, therefore, that Gov. Dongan had authority to issue *280 the patent of 1686, the law would presume such authority, and at this late day, that the consent of the government to its exercise had been previously given or that the act had been subsequently ratified.
“ The grants of colonial governors before the revolution,” says the supreme court of the United States, in the Arredondo case, “have always been and yet are plenary evidence of the grant itself, as well as authority to dispose of the public lands.” “ The actual exercise of authority to make a grant without any evidence of disavowal, revocation or denial by the king, and his consequent acquiescence or presumed ratification, are sufficient proof, in the absence of evidence to the contrary, of the royal assent to the exercise of his prerogative by his local governors.” We have however in this case, on the part of the plaintiffs, evidence of the commissions to Dongan, issued by the duke of York, whilst proprietor of the soil of the province, and by James II. king of Great Britain, in June, 1686. By the former, he is to perform and execute all the powers, which by letters patent granted to the duke of York by his sovereign, the duke himself, his deputy, agent or assigns, might execute; by the latter, jurisdiction over the subject matter of grants of land is specially given; the exercise of this jurisdiction being by and with the advice and consent of the council, and the grants being under the seal of the province, reserving such moderate quit rents as the governor with the advice aforesaid, should think fit.
This it is contended was a jurisdiction that could, only be exercised with the advice and consent of the council, and that without such advice and consent no authority existed. Should this position be admitted, the authority being exercised by the officer with whom it was lodged, tinder the seal of the province, the presumption of law is that such advice and consent were given. It certainly would "not be necessary for the grantee to show primarily and affirmatively, for the purpose of giving validity to the grant, that the council had advised and consented to its being made by the governor. The presumption, of course, would fail, if there was affirmative proof that the consent of the council had not been given, or that it had been with *281 held, or that they or the king had subsequently disavowed the act. But I do not think that proof, that recently the office of the secretary of state has been searched, and no order of council could be found therein, either in rough minutes, or in books which purport to be records of the orders of council, advising or consenting to the issuing of the patent of 1686, is sufficient to overthrow the legal presumption. Such proof is merely of a negative character, on which a bare conjecture might be founded, but showing nothing affirmatively or conclusively. Even one of the witnesses who made the search, entertains no doubt that many of the colonial papers have been lost; and it can not be said that the doubt is not well founded, when the facts are taken into consideration that the orders of the council were sometimes indorsed upon loose papers or petitions; that the books and papers of the colonial government, or such as could be found, were removed from New-York to Albany, and more recently from one state hall to another. Besides, had it been shown beyond peradventure, that a formal order had never been made, advising and consenting to the patent of 1686, still that fact would not have been conclusive that consent was withheld by the council. It was not absolutely necessary that such consent should be evidenced by the entry of a formal order. The inference would still remain from the fact of the authority being exercised by the proper officer, the record of it being made in the proper office of the province, the seal of the province being affixed, and the apparent acquiescence of the council, that their consent had been given. It is unnecessary to inquire as to the authority of the governor to make grants of the public domain without reserving quit rents, as in the patent of 1685 a rent was reserved. The amount and extent of such reservation rested in the governor’s discretion. If that discretion was abused, he was responsible to his government for such abuse; but neither that government, nor any other, will collaterally disturb individual rights, for any thing done in the exercise of a discretion within the authority and power conferred.
It is further urged that the patent is void for the reason that it purports to erect a manor, which neither the king nor the *282 lieutenant governor had power to do. Manors, in England, seem to have been districts of land held by lords or noted personages, who usually resided upon them, reserving so much land as was necessary for the use of their families, and distributing the remainder amongst their tenants by two different modes of tenure—the one by deed under certain rents and free services, and the other by no assurance in writing, but being held in villenage at the pleasure of the lord. The statute of quia emptores, 18 Edw. 1, ch. 1, directed that upon such sales or feoffments the feoffee should hold the same not of his immediate feoffor, but of the chief lord of the fee, of whom such feoffor himself held it. The statutes of 17 Edw. 2, ch. 6, and 34 Edw. 3, ch. 15, extended the same provisions to the king’s own tenants in capita. Prior to these statutes the great barons, holding under the crown, had granted out frequently smaller manors to inferior persons, to be holden of themselves; and these inferior lords carved out and granted to others still more minute estates to be holden of them. By the statute of 34 Edw. 3, all subiufeodations previous to the reign of Edw. 1, were confirmed, but all subsequent to that period were left open to the king’s prerogative ; “ and from hence,” says Sir William Blackstone, “ it is clear that all manors existing at this day (in England) must have existed as early as King Edward I. for it is essential to a manor that there be tenants to hold of the lord, and by the operation of these statutes no tenant in capita since the accession of that prince, and no tenant of a common lord since the statute of quia emptoras, could create any new tenants to hold of himself.” (2 Bl. Com. 90, 91, 92.) The argument of counsel substantially is, that the statutes referred to, if not directly, at least by implication forbade the erection of any manor subsequent to their adoption; that in that respect they had modified the common law of England, which was the common law of the colony of New-York, and that the patent of 1686, having purported to erect a manor and grant manorial privileges, the instrument is void in tofo. I have not the leisure, nor are the books within my reach to pursue the inquiries whether the statutes to which allusion has been made, were ever in force in the colony, or
*283 whether the English common Iaxv, as modified by them, was the common law of the colony in 1686; or whether, in fact, the king or his governor could legally grant manorial rights and privileges. With the view I take of the point raised, I can not deem the pursuit of these inquiries important. It may be remarked, however, that the acts of the colonial government and legislature and the statutes of the state recognize the existence of manors. Conceding that the grant of manorial privileges was illegal, still the patent would be good for what the crown or its agents might legally grant. A patent may be good for one thing and void for another. (5 Denio, 389.) The coupling in the same instrument of an invalid grant with one which the sovereign could undoubtedly make, does not produce the effect to render the entire instrument void. In the case of Doe ex dem. Thompson v. Pitcher, (2 Marsh, 61; IS. C. 6 Taunt. 369,) a deed of land was made in direct violation of one of the British statutes of mortmain, declaring conveyances for charitable uses absolutely void unless made a specified period of time before the death of the donor, and attested and enrolled in a particular way; but the deed also purported to convey other land which it would have clearly carried, if of that only. The objection was made that all was void under the statute. The Lord Chief Justice Gibbs, in adverting to that objection said, “ it was admitted that if it were a case of common law that would not be a consequence ; for then it would be void as to so much only as falls within the objection, and good as to the rest. The truth is, there is no differeuce between a transaction illegal at common law and by statute; and the objection being that this deed conveys property in a way that is prohibited, whether by the common law or by statute, the construction is the same. Taking it to go no farther than as I now state, it follows that that which conveys illegally is void, and that which conveys legally is valid. A statute when it prohibits a thing may go farther and say that the deed by which it is done shall be void, and then a court of law must decide that it is void to all intents and purposes, because the legislature has said so.” In this opinion the court agreed. It has also been decided by the supreme court of the *284 United States, that if a state grant a tract of land, part of which is within its territory and part not, the patent is good for that portion within the territory of the state, and void as to that part beyond it.
Another objection is, that there is no evidence of a survey of the premises granted prior to the issuing of the patent. The authority of the governor, or the validity of the grant, certainly can not depend on the question whether there had been a previous survey of the premises granted. But the patent itself, as was said in The People v. Mauran, (5 Denio, 389,) “ is prima facie evidence that it was regularly issued—that all things preliminary had been performed and complied with; the legal presumption in such case being that public officers have done their duty, omnia solemniter acta.” (9 Cranch, 87.) Moreover a patent can not be questioned collaterally in a court of law, and avoided for an alledged non-observance of preliminary requisites.
Most of the objections that have been considered relate either directly or indirectly to the questions of regularity, and authority of the officer. The decisions of the courts very generally agree that a patent can not be attacked collaterally for an irregularity in the issuing of it, if it be valid upon its face. The question of authority is always an open one.
There is still another objection to the patent of 1686, remaining to be considered, which avoids the question of regularity and authority. It is that the patent was issued upon the false suggestions of the patentee, and that the crown was thereby deceived. I shall consider this point as though the sovereign himself, who issued the patent, was attempting to avoid it on the ground of deception. In examining the point, we are met in the outset with the inquiries, are letters patent issued by mistake, or upon false suggestions, absolutely void, or voidable only; and may they be impeached collaterally for fraud, or mistake, in a court of law in an action against an individual to recover the possession of the premises granted, or can they only be avoided for those causes in a regular course of pleading in chancery, founded on a proceeding by scire facias, or by bill, or information in which the fraud or mistake is directly put in issue. It is *285 undoubtedly true that when a patent is void upon its face from false suggestion appearing thereon, showing as a matter of law that the king was deceived in making the grant, as to the consideration or otherwise, (and for this purpose all the recitals in the patent as inducing it, are to be taken as the suggestions of the patentee,) it has been held to be the duty of the court, even collaterally, to pronounce it void: and there are a few cases in the English books on informations of intrusion, by the attorney general, or in actions of trespass or ejectment between individuals, where this seems to have been done collaterally, on proof dehors the instrument falsifying its recitals. It is said in the case of Gladstone v. Earl of Sandwich, (4 Man. & Gr. 1028,) that “ the cases in which the king’s grant has been held to be avoided by reason of any misdescription or mistake therein, will be found to fall under one of three classes: 1. When the king by his grant has professed to give a greater estate than he had himself in the subject matter of the grant, as in the case of Alton Woods, (1 Coke, 43.) 2. Where the king has already granted the same estate to another, in which case the second grant would work injustice, or at all events, great inconvenience. Such was the case of Alcock v. Cook, (5 Bing. 346;) or 3. When the king has been deceived in the consideration expressed in the grant, as where the consideration has been untruly stated, or the subject of the grant has been recited to be of less value than it really is, or where, as in the’ case of Mead v. Southwell, (2 Roll. Abr. 189,) the king recites a former grant of an office for life, and a surrender, and then grants the same office to J. S., whereas in truth, either the king has not granted the office for life, or the office had not been surrendered. Here the grant would be void, because there was no such consideration as was recited.”
In the first two classes, the question of title or authority in the sovereign was involved. This all the cases admit may be inquired into collaterally. In the latter class the question of fraud arose in several of the cases, it appearing in some on the face of the patent, and being shown in a few collaterally by the patent itself, and proof dehors the record. In this state, however, it seems to be settled, (and I am to be controlled by the de *286 cisions of our own courts,) that unless letters patent are absolutely void on their face, or the issuing of them was without authority, or was prohibited by statute, they can only be avoided by a regular course of pleading, in which the fraud, irregularity or mistake is directly put in issue. I confess that I deem this rule most in consonance with justice and equity. (Jackson v. Lawton, 10 John. 23. Jackson v. Hart, 12 Id. 77. People v. Mauran, 5 Denio, 389.) (a) In Jackson v. Lawton the court said, “ the fraud must appear on the face of the patent, to render it void in a court of law; and where the fraud or other defect arises on circumstances dehors the grant, the grant is voidable only by suit. The regular tribunal for-this purpose is chancery, founded on a proceeding by scire facias, or by bill or information. It would be against precedent, and of dangerous consequences to titles, to permit letters patent (which are solemn grants of record) to be impeached collaterally by parol proof in an action of ejectment.” In Jackson v. Hart, Platt, J. in delivering the opinion of the court held this language: “ The state may be deceived, or a grant may be made through mistake, but the plain remedy is to vacate such grant by scire facias. * * * The old remedy of summoning the patentee before a judicial tribunal, for the direct and express purpose of showing cause why the grant should not be vacated, on the ground of fraud or mistake, is wisest and safest, if not the only constitutional mode of vacating such a grant. * * * To impeach a public grant of record in this collateral manner (in an action of ejectment) operates as an unfair surprise upon the patentee ; it would supersede and abolish the safe and easy remedy by scire facias which is sanctioned by the wisdom and experience of ages, and in my judgment it would be a dangerous innovation.” And in the recent case of the People v. Mauran, the court said “ a patent being a record, unless it is absolutely void on its face, it can not be assailed in a collateral action, but only in a proceeding directly for the purpose; and this is even true, though it were issued by mistake, or obtained by fraud or misrepresentation. *287 It can not be affected but by a regular course of pleading on bill or scire facias. In such cases an objection can not be set up in actions of trespass or ejectment. This rule is not founded merely on a principle of evidence, regarding the admissibility of testimony, but on the principle that a record can not be overthrown, except by a judgment of a court on an issue upon the precise question, of its validity. The fact therefore, that in the present case the evidence was before the court, and was produced by the defendants themselves, did in no respect alter the rule. To use the language of the chief justice of Kentucky in the case of Bledsoe's Devisees v. Wells, (4 Bibb, 329,) a patent 11 can not be avoided by matter dehors the grant. The commonwealth can not be divested of her title except by record,” and she- can not be reinvested except by matter of record. (Com. Dig. Patent 7, 1 to 8.) No evidence from without can affect a record except it be put directly in issue.” (See also Jackson v. March, 6 Cowen, 281.) Similar doctrines have been uniformly held in the supreme court of the United States. (6 Peters, 342. 11 Wheaton, 384.)
Were I inclined therefore in this case, to adopt and act upon the principle of allowing a public grant of record to be assailed collaterally, in an action of this character, by proof dehors the grant, I should do so in disregard of the repeated decisions of the courts of this state, to which it is my duty to yield, and which as authority I am bound to observe and respect. It is urged that a part of the proof here, on which the plaintiffs rely to show the fraud, was introduced without objection, and a part by the defendant himself, and that that should vary the rule. But the case of the People v. Mauran is in point to show that the record not being directly in issue, it can make no difference how the evidence gets into the case.
But were I authorized to look at the evidence dehors the grant of 1686, with a view of determining whether such grant was procured by the fraudulent suggestions of the grantee, I should entertain doubt as to the proof satisfactorily establishing the fact that Gov. Dongan was deceived as to the limits and extent of the lands granted. I should be compelled of course to *288 look at the patent of 1688 as a single record, and the proof particularly applicable to it. In that patent there are but two facts recited, that can be said to be the suggestions of the patentee, viz.: That the tracts of land recited as having been granted by two former patents, lie together, and that Livingston had been at vast charges and expense in purchasing the tracts from the Indians, and in settling and improving the same. The recitals of the former grants, as they were matters of public record, are to be regarded as the recitals of the crown, and not the suggestions of the patentee. The allegations of the plaintiffs are that the first recited tract, or that granted by the patent of 1684, consisted of 2000 acres of land, extending several miles along the Hudson river, and having the river as its western boundary, and extending so far eastward into the woods as to make that quantity of land—that the second recited tract, or that granted by the patent of 1685, was known as Taghkanic, and consisted of 600 acres, bounded west by the Roeliff Jansen’s kill, south by Taghkanic creek, and enclosed by those two streams and a line on the north side running from one to the other—that the two tracts were eighteen miles apart, and together comprised 2600 acres ; and that the representations of the patentee that they lay together, inducing the crown to include them in general boundaries, which boundaries included all the land lying between them, was false, and a fraud upon the government. There can be but little difficulty in locating the patent of 1684, but it is otherwise as to that of 1685. If the latter patent embraced but 600 acres, and was meant only to include the low or flat land, known as Taghkanic flats even in the memory of witnesses, then it is evident that the tracts did not lie together, but that a considerable extent of country intervened, which was included in the general boundaries of the patent of 1688. It is difficult however to satisfactorily determine the limits and bounds of the grant of 1685. In the grant the tract is called Taghkanic, and the boundaries are described by indian names of places. There is scarcely an indian name mentioned in the patents of 1685, (whether those names were intended to designate monuments or streams) now known with certainty. The tract grant *289 ed by the patent of 1685 is supposed by the plaintiffs to have been bounded on the west by the Roeliff Johnson’s kill, and to have had the Taghkanic creek as its southerly boundary. This supposition is founded on the statement of one or two witnesses that there is no stream of any magnitude west of the Roeliff Johnson’s kill, and none is laid down in Wigram’s map of the town of Livingston. The patent makes a creek the western boundary of the tract. The tract, as the plaintiffs now assume to locate it, consisted of 600 acres of flat or plain land lying in an angle formed by the Taghkanic creek and Roeliff Johnson’s kill. The patent describes the tract conveyed as beginning behind Patkook (a place now unknown) on the northwest side' of the Roeliff Johnson’s kill, which kill runs along the flat or plain land at a place called by the natives Minisicktanock. The flat land seems from the description to have been called by the indians Minisicktanock, and not Taghkanic. From the starting point the course given is along a small kill to a valley that leads to a small creek called by the indians Quissickook, and over the said creek to a high place, westward of a high mountain, thence westward to a small hill on the side of a creek called Shampook, and so runs along the east side of said creek, which a little lower is called by the name of Twastawekack. The Twastawekack is the westerly bound of the tract, and not the Roeliff Johnson’s kill, unless a part of the kill was known by the former name. The southerly bounds begin on the south side of the creek. The plaintiffs’ location (if this creek be Taghkanic) confines the tract to the northward thereof. The tract is also described as running along the foot of a high mountain to a hill called by the indians Masnanosick, and from thence westward to a creek called by the natives Nackawawackkano, which creek empties into the Twastawekack, at a place called Mawicknack. There are but two creeks that touch the supposed location of the plaintiffs: no creek crosses it. The plaintiffs contend that the whole tract described in the patent embraces but about 600 acres and is called Taghkanic, whilst the defendant urges that the flat or plain land contains about that number of acres, and that the whole tract, including the flat or plain *290 land, is called Taghkanic. If it were important therefore, in this case, in the shape which it at present assumes, the difficulty of correctly locating the patent of 1685 will be perceived ; and before it can be urged with force that the government was deceived as to the extent off the tract granted by the patent of 1686, it ought clearly to appear that the tracts granted by the patents of 1684 and 1685 were not in immediate proximity; that the government was induced by the representations of Livingston to suppose that they were; that it was not intended by the government to include within the general boundaries of the patent of 1686 any other lands than those previously granted; and that imposed upon by the false suggestions of Livingston, other lands were included.
It is possible that the tracts first granted did not lie in close proximity, but it is singular indeed, if the plaintiffs’ theory that they were eighteen miles apart, embracing together but 2600 acres, of which much the largest portion was forest land, be the true one, that Livingston should apply, and the lieutenant governor, under the seal of the province, should formally grant by general boundaries, and erect into a lordship or manor, so inconsiderable and then almost valueless territory. Were I called upon to pass upon the question, whether the crown was deceived as to the extent of the grant of 1686; so as to render it void, the only evidence to base an affirmative conclusion, (admitting that the tracts did not lie together) would be the statement in the patent itself that they were adjacent to each other. Making this the statement of Livingston, the inference might possibly be fairly deducible, were there no contemporaneous acts to rebut it, that the agent of the crown was induced to grant all the land included in the patent of 1686, in the belief that nothing was being granted except two small tracts, the title of the crown to which had previously passed to Livingston. But taking into consideration the facts, that from the date of the patent of 1686, during Dongan’s administration and subsequently, Livingston notoriously claimed under the patent a much larger extent of land than 2600 acres, that it was never asserted or pretended by the crown, or the colonial government, that it had been de *291 ceived as to the limits of the grant; that prior to the patent of 1715, and whilst Livingston assumed to hold under that of 1686, the crown itself acknowledged and admitted his title by purchasing from him 6000 acres, parcel of the land embraced in the general boundaries of the patent of 1686, which land was not in the grant of 1684 or in that of 1685, if the plaintiffs’ location be correct, it would appear to be going a great way, at this late day, to find the fact that the government, in issuing the patent of 1686, was in truth deceived as to its extent. Thus much I have said on the question of fraud, not with the view of finding the fact either way, but rather in corroboration of the opinion, that in a case upon the direct issue, there would be perhaps an insurmountable difficulty in arriving at a satisfactory conclusion.
I have thus alluded at length to the objections taken by the plaintiffs to the patent of 1686. So far as these objections relate to the questions of regularity or authority, I am of the opinion that they are unfounded. In this I may be mistaken, and may have misapprehended the point and force of the authorities. If so, the appellate courts will correct the error. No one will bow more reverently than myself to their superior judgment. With regard to the question whether a patent may be attacked collaterally for fraud or misrepresentation, when the fraud does not appear on the face of the patent, but is to be established dehors the record, I am constrained to follow the decisions of our own courts. These I deem conclusive upon me, until instructed that the law is otherwise. I should add, however, in relation to the patent of 1686, that upon the assumption that it was issued irregularly, and that even the government was deceived, at the time, as to the extent of the lands granted, a question would still remain, whether in 1691, it had not been ratified and confirmed by an act of the colonial legislature.
In May, 1691, an act was passed by the colonial legislature “ for the settling, quieting and confirming unto the cities, towns, manors and freeholders within the province, their several grants, patents and rights respectively.” This act was subsequently approved by the home government and became a law of this state by constitutional adoption. The first section enacts “that *292 all the charters, patents, grants, made, given and granted, and well and truly executed under the seal of this province, constituted and authorized by their late and present majesties, the kings of England, and registered in the secretary’s office, unto the general and respective corporations or bodies politic of the cities, towns and manors, and also to the several and respective freeholders within the province, are and shall forever be deemed, esteemed and reputed good and effectual charters, patents and grants, authentic in the law against their majesties, their heirs and successors forever, notwithstanding of the want of forms in the law or the non-feasance of any right, privilege or custom which ought to have been done heretofore by the constitutions and directions contained in the respective charters, patents and grants aforesaid.”
The second section provides, “ that all the charters, patents, grants, made, given and granted as aforesaid, unto all and every the several and respective corporations or bodies politic of the cities, towns and manors, and also unto all and every the respective freeholders, their heirs and assigns forever, within this province, are to all intents and purposes whatsoever hereby ratified and confirmed. To have, hold, exercise, occupy, possess and enjoy all their and every of their former rights, customs, prerogatives, privileges, pre-eminences, practices, immunities, liberties, franchises, royalties and usages whatsoever, in as full and ample manner as if none of the changes, alterations, disturbances, want of other forms in the law, or the non-feasance of any rights, privileges or customs of any corporation aforesaid had ever happened or been neglected, anything herein contained or in any other law to the contrary in any wise notwithstanding: Provided, that nothing herein contained shall be construed or taken to bar any person or persons of his or their former and just right or pretences to any house, tract or parcel of land within this province; always provided that he or they that have any such just right or pretence do make his or their claim within the space of five years next after the date hereof; and also provided that nothing herein contained shall be intended or construed to the prejudice or hindrance of the title or claim of any *293 person under age, feme covert, non compos mentis, imprisoned, or beyond the seas.”
If the intention and effect of the act was to ratify and. confirm as against the crown, all patents and grants of land to individuals, as well as patents and grants of corporate rights and privileges, that had been issued by governors, under the house of Stuart and the then reigning sovereigns, that had passed the seal of the province and been registered in the secretary’s office —the patent of 1686 would be embraced within its provisions. If on the contrary, it was simply intended to save and assure corporate rights and privileges, notwithstanding such rights and privileges might have been technically lost by non-feasance, and also the rights and privileges of freeholders in cities, towns and manors where the charters, patents or grants had been given or made either by the reigning house, then just come to the throne, or the excluded house of Stuart, the patent of 1686 would not be affected by it. For several years prior to the passage of the act, England had been politically convulsed—these convulsions extended to the colonies, and had bred factions either devoted to the house of Stuart or the prince of Orange. The revolution of 1688, having driven the Stuarts from the throne, in 1690 an act of parliament was passed recognizing William and Mary as the lawful sovereigns, and declaring the acts of the last parliament good and valid. This was followed in the province of New-York, the next year afterwards, by the passage of two acts on the same day: The first reciting the troubles which had been brought upon the colony by its political dissensions, and recognizing and acknowledging William and Mary as being, as of right they ought to be by the laws of the realm of England, king and queen, &c. The second was the act above recited. The counsel, for the plaintiffs supposes that the only .intent of the. latter act was to guard against loss from two sources, viz. that from the change of dynasty which had been effected, as was supposed by many, by an unconstitutional measure; and secondly, that if there were conditions to the grant the non-performance of which would operate as a forfeiture, such non-feasance during the troublesome times of the revolution should be saved. *294 It is probably true that the disturbed state of the public mind, incident to a thorough change by revolution of one dynasty for another, and the feverish alarm pervading the province as to the acknowledgment or security of rights or privileges given, made or granted by charters, patents or grants, under or by authority of a dethroned dynasty, led to the passage of the act of 1691. It was an act of a purely conservative character, having for its avowed object the healing of disturbances, the quieting and satisfying the public mind and encouraging the settlement and improvement, and the growth and strength of the province, by a legislative ratification and confirmation “ of the rights and privileges formerly held by and granted to the respective cities, towns, manors and freeholders within the province.” It is not doubted that the act confirmed, as against the crown, the charters, patents and grants of municipal corporations or bodies politic, and the rights and privileges secured thereby to freeholders therein. The only doubt is, whether it was intended to apply to patents or grants of land to individuals. The language of the second section would seem to be broad enough to cover the last named description of grants. The proviso saving the rights of individuals to any “ house, tract or parcel of land,” also favors such a construction, and appears to lead to the inference that the legislature was speaking as well of patents or grants of land as of corporate rights. The object avowed for the passage of the act was to be promoted, in the then state of the colony, probably as thoroughly by the confirmation of patents or grants of land, as of charters or grants of municipal rights. The “many changes, alterations and disturbances” alluded to in the preamble to the act, had affected perhaps to as great an extent the proprietors of land as any other class of the subjects of the crown. If then, the act of 1691 was intended to apply to patents or grants of land to individuals, (and I am inclined to think that that is the fair construction of it,) it confirmed as against the crown the patent of 1686, so far at least as it might have been irregular or defective from “ want of forms in the law.”
But exclusive reliance is not placed by the defendant on the patent of 1686. In October, 1715, during the administration *295 of Governor Hunter, another patent was issued to Livingston, in the name of the crown, granting the same land embraced in that of 1686, with the exception of 6000 acres which prior to the grant of 1715, had been purchased from Livingston for the use of Orneen Anne and her successors. It also granted to Livingston, and the inhabitants and freeholders of the manor, the privilege to choose a representative to the general assembly of the province, and assessors, collectors and constables. This patent the counsel for the plaintiffs contends is absolutely void for the reasons—
1st. That it purports to erect a manor.
2d. That the governor had no power to grant without reserving quit rents.
3d. That the council did not authorize, advise or consent to the issuing of it. These several objections have been considered in reference to the patent of 1686, and the views expressed will not be repeated; it is also urged to be void for other reasons:
1st. That it is not signed. This is no valid objection. In practice probably, the governor generally signed patents that were issued; but as it has been said by the court, “ it is the great seal which authenticates the patent.” (10 Wend. 654.) The fact of the seal being affixed is per se to be regarded as prima facie evidence that the patent was approved of by the governor, and issued by his direction.
2d. That the patent was procured in fraud of the government, by the fraudulent and deceptive representations of Livingston.
Nothing appears on the face of the patent of 1715, showing it to have been fraudulently obtained, or from which the court is called upon collaterally to declare it void; and I have already said that following the repeated decisions of our own courts, a patent can not be collaterally impeached by proof, dehors the record, tending to show fraud or misrepresentation in procuring it. But if the question of fraud was an open one, in an action of this character, greater difficulty would probably arise in impeaching the patent of 1715, on that ground, than that of 1686. It could not be seriously contended that the executive officer of the crown was deceived as to the extent of the grant. Aji actual survey *296 of the land granted was incorporated in the patent, and the quantity was to be easily and correctly ascertained. Nor upon the assumption that the government was deceived in 1686, could it be urged that the truth was not fully known prior to the grant of 1715, as in 1710 (in the reign of (Queen Anne,) the government itself purchased of Livingston 6000 acres included in the general boundaries of the patent of 1686, and being in quantity more than twice that which the counsel for the plaintiffs now contends was granted to Livingston by the patents of 1684 and 1685, and which he supposes the government only intended to include in the general boundaries of what he calls the confirmation of 1686. In relation to the patent of 1686 the inference is drawn from the recital, that the tracts granted in 1684 and 1685, lay adjacent; that Livingston intended to induce, and did induce the belief on the. part of the government, that only the two tracts were included in the general boundaries. The patent of 1715, whilst reciting the fact that the tracts granted in 1684 and 1685, lay adjacent, also recites, that on application to Dongan for the patent of 1686, Livingston set forth and made it appear, “ that he had been at vast charge and expense in purchasing the two tracts and other lands adjoining, comprehended in general boundaries, from the native proprietors.” This recital tends to negative the inference that Dongan granted the patent of 1686, believing that all the land included in the general boundaries, was embraced in the patents of 1684 and 1685 ; yet, if the grant was in any degree induced by the representations that the indian claim or title to “ other lands adjoining,” had been purchased, it might raise the question of the truth of such representations. There is nothing in the proof adduced, from which it may be inferred that purchases from the indians of “ other lands,” had not been made by Livingston, except the fact that no indian deed (though Livingston was clerk of the county’ of Albany,) can be found in the office of the secretary of state, or on the records of the county of Albany, other than for the two tracts described in the patents of 1684 and 1685. This perhaps would be satisfactory, had the law or the uniform political regulations of the colony required that in all cases the *297 evidence of the extinguishment of the indian claim should be preserved in the office of the colonial secretary, or on the county record. But neither by the law, nor in practice, was this uniformly required.
I entertained the opinion on the trial, and it has been confirmed by subsequent examination, that assuming that the patent of 1686 was defective, and that it had not been aided by the confirmatory act of 1691, that of 1715 was valid and passed the title of the crown to the lands described therein. Whatever may be said respecting the colonial government being deceived as to the extent of the grant, in speaking of the patent of 1686, it is very apparent to my mind that there was no deception in 1715— that if the grant was made in 1686, without knowing that it covered 160,000 acres, the officers of the crown had been undeceived either prior to, or contemporaneous with the issuing of the patent of 1715. The patent of 1715,1 regard in effect as a new grant, made with a full knowledge of its extent, reserving a part of the land originally granted, and investing Livingston and the inhabitants and freeholders of the manor, with additional privileges, amongst which was the right of representation; a right soon after exercised, and never under any pretext called in question by the government. It may also be regarded as a confirmation by the reigning sovereign of the grant of 1686, so far as related to lands embraced in that grant, and which it did not, in terms, specifically except.
My conclusions as respects both the patents of 1686 and 1715 are:
1st. That they were issued in due form to pass the title of the crown, and that nothing appears upon their face to render them void in law:
2d. That the proof does not show affirmatively that they were issued without authority; the grants themselves, in the absence of such affirmative proof, being plenary evidence of authority in the colonial governors:
3d. That the patents being evidence prima facie that they were regularly issued, and that all things preliminary had been complied with, the proof in opposition thereto, is too conjectural, *298 unsatisfactory and insufficient on which to find the fact of irregularity :
4th. That if the patents were obtained by fraud or misrepresentation, they can not for that reason be assailed collaterally, in an action to recover the possession of lands; but can only be avoided by a regular course of pleading on bill or scire facias, on which the fraud or misrepresentation is directly put in issue.
Holding that either of the patents is valid, disposes of this case in favor of the defendants. The title to the tract called the manor, (in which the premises in suit are included,) will have been legally in the defendant’s ancestors at the involution. That revolution, with regard to property, in no wise affected their previous rights. The people of this state, by the change of government, acquired no title to lands, not then remaining in the British crown.
Extravagant grants of the public lands with uncertain boundaries by several of the governors of the province, tended doubtless to retard its growth and strength, and lessen the revenue of the crown arising from quit rents. Amongst those most profuse and lavish in granting the king’s land, were Colonel Fletcher and Lord Cornbury, both of whom wielded the executive power of the province subsequent to the revolution which dethroned the Stuarts. No grants seem to have been directly questioned by the crown or colonial government, except some of an extravagant character made by Fletcher. During the administration of the earl of Bellamont, an act was passed by the assembly vacating several of this description of grants. These large grants of land were, in some cases, held under their proprietor by a tenure, not even in the colony favorable to their settlement and improvement, and the moral and social elevation of the tenants. This tenure prevailed at the revolution, and has been continued, though to a less extent, to the present time. That it is antagonistical to free institutions, the enlightened of all classes admit. That it retards the accumulation of property by those immediately engaged in cultivating the soil; paralyzes their energies and weakens an innate sense of independence, can not be denied. That it begets jealousies, excites prejudice *299 and fosters invidious distinctions amongst our citizens, is fully-manifested by the experience-of the past. It is not surprising, therefore, that where these tenures exist, affecting large numbers, there should be indications of popular convulsion and disquietude. It would indeed be more remarkable if the enlightened proprietor of an extensive tract of land, marking the inj urious fruits of a tenure on a people whose laws shield and protect him in the enjoyment of his property, should not earnestly desire and zealously aim to effect its abolition. But under no circumstances, should the influence of popular convulsion be permitted to invade the courts, or control, in the slightest measure, the administration of the law. Individual rights would be insecure ; titles afloat and at hazard, without an enlightened, firm and rigid adherence by the courts to the rules of the statute and common law affecting real property. Those rules have been sanctioned by experience, and illumined by the wisdom of the past, and their object and end is personal protection and security. For a court in a single case to falter in the application of known and fixed principles of law relating to real property, might be, in effect, to unsettle and throw into utter confusion and uncertainty all titles to lands. Consequences like these would be infinitely more to be deplored than the continuance for a season of a relic of feudalism.
The importance of this case has, I think, been unreasonably magnified. That it should have had any extraordinary importance arises from the fact of the Livingston title being necessarily involved—the land sought to be recovered being comparatively valueless. It was asserted on the trial, that not one-sixth of the original tract is now held under lease—the remainder being granted and held in fee. Much the largest portion of the tract so granted, has doubtless been actually occupied for a long period of time. In relation to lots so occupied, should the people sue or implead the occupant, another and perhaps controlling branch of defence, apart from the paper title, or the recognition of such title by the colonial or state governments, will arise.
Judgment for the defendant.

 See also Parmelee v. The Oswego and Syracuse Railroad Co., (7 Barb. S Court Rep. 622.)