By the Court—Bosworth, Ch. J.
The plaintiff claims title under Charles Henry Hall, to the premises in question. These premises are on the westerly side of Harlem river, between high and low water mark, or wholly easterly of low water mark.
Charles Henry Hall’s paper title to a part of the premises, (if any he had,) is under a deed from John Adriance, dated June 27, 1825. This deed bounds the premises .which it professes, to convey, “ easterly on the Harlem river.”
The deed under which said Hall obtained whatever of documentary title he has to the residue of the premises, is from Gabriel Furman, is dated June 25,1825, and describes the premises conveyed by it “ as bounded easterly by the Harlem river " and as “including the purchases heretofore made by Gabriel Furman, of William Daivrence, Gabriel Ludlow, Master in Chancery, Peter Meyer and others, and Peter Meyer, containing 40 acres more or less.” The deed from William Lawrence to Gabriel Furman, is dated July 26, 1804, and describes the land which it conveys, as running “ along land of John Adriance, north 88° 10' east, 13 chains and 50 links, to high water mark on the Harlem river; thence along high water marie in Harlem river, *255 north 3° 11' west 3 chains 6 links; thence along the same north 28° 30' west 4 chains and 11 links, to lands of John Meyers,” &c.
These are the only conveyances to Charles Henry Hall, which pretend to vest in him any title to the premises in question. .
The Harlem river, opposite these premises, and for some distance above and below them, is a navigable stream, where the tide ebbs and flows.
These deeds do not convey any title to the premises in question, to Charles Henry Hall. (Gould v. The Hudson R. R. Co., 2 Seld., 522; Furman v. The Mayor, &c., of New York, 5 Sandf., 16; 6 Seld., 567; Halsey v. McCormick, 3 Kern., 297.)
Ho such occupancy by Charles Henry Hall and those claiming under him, is shown, as is requisite to constitute a title by adverse possession.
To constitute an adverse possession, where the claim of title is not founded upon some written instrument or some judgment or decree, apparently transferring a claim of right, there must have been “ an actual continued occupation,” under claim of title, and in such cases only “ the . premises so actually occupied, and no other, shall be deemed to be held adversely.” (2 R. S., 294, § 11; Code, § 84.) In such a case there cannot be said to have been an occupation, unless the land claimed to have been possessed, “ has been protected by a substantial inclosure,” or “ has been usually cultivated or improved. (2 R. S., 294, § 12; Code, § 85.)
Large portions of the premises in question have never been protected by a substantial, or any other inclosure. Hor have they been cultivated; nor has any part of them been improved, unless the parts on which bulkheads have been erected, or those parts which have been filled in with earth, may be said to have been thereby improved.
The fact that on the lines of the land running easterly to the river, fences were continued down below high water mark, (or even below low water mark, if that was in truth *256 done,) for the purpose of preventing the passage of cattle upon the upland, is not of itself such occupancy as the statute declares to be indispensable, nor does it amount to an inclosure of the premises. On the easterly side, (the Haflem river,) there was no fence or erection, either on the line or within the waters of the Harlem river. There was, therefore, not only the absence of any substantial inclosure of the whole premises, but there was not in fact an in closure of any kind.
There was no occupation, except of the limited portions covered by bulkheads, filled in with earth, unless the cutting of the sea weed amounts to an, occupation.
One witness (Peter Randel) says that “ we fished on the Adriance property, three or four different seines; the fishermen came up on the upland, and had their fishing houses on the upland; they quit fishing about the time Mr. Hall bought; they had done this as long as I can remember, from the time I was a boy.” He had lived on the Adriance property from 1814 to 1825. He says “I used to cut sedge that grew on land between high and low water mark, to make manure.”
He says “ the custom has been for the person owning the upland, to cut the sedge growing in front of his premises.”
The testimony of the other witnesses in respect to cutting sedge is substantially the same. This shows that they claimed the right to cut the sedge as owners of the upland, and not as owners of the land on which the sedge grew. (See Emans v. Turnbull, 2 Johns., 313; and Smith v. Levinus, 4 Seld., 472.)
There is, therefore, no just ground for the claim that the plaintiff .has shown himself capable of conveying to the defendant, an unincumbered title in fee simple to the premises, unless he has shown that the title was in the Mayor, Aldermen and Commonalty of the City of Hew York, at the time of the aforesaid conveyances to Charles Henry Hall, and that the latter is now estopped, by facts proved, from denying the plaintiff’s title.
*257 The Dongan charter, dated April 27,1686, conveys to the Mayor, &c., “ all the waste, vacant, unpatented, and unappropriated lands lying and being within the said City of New York, and on Manhattan’s Island aforesaid, extending and reaching to the low water mark,” &c.
The Montgomerie Charter, dated June 15th, 1730, recites and confirms the former patent.
In 1838, the premises in question were assessed for taxes to Charles Henry Hall, for the taxes of that year, and he paid them.
In 1849, and since, they have been assessed for taxes, and the taxes have been paid by Mr. Hall, or those claiming under him, and during this period they were assessed as the property of the person, claiming title at the time of such assessment.
No law has been cited which declares that assessing lands for taxes, as being the property of a particular person, and the payment by such person of the taxes so assessed, for the period during which that was proved to have been done in respect to the premises in question, or for any period of time, shall divest the true owner of his title, and vest it in the person paying the taxes thus assessed.
It is not one of the modes specified in the statute, by which one having no title, can acquire a good title. In Rose v. Klinger, (8 Watts & Serg., 178, 180,) it is said that the payment of taxes for several years by one claiming title, is not evidence of title, though it may be some evidence of the extent of his claim.
We think that the exceptions taken to the decisions of the Court at Special Term, are untenable, and that the judgment should be affirmed, with costs.