ELIZABETH D. DE LANCEY, Respondent, *v.* HENRY PIEPGRAS, Impleaded, etc., Appellant.

A grant by the sovereign power of some prerogative right to a citizen, to be held by him as private property, is to be construed strictly; an intent to part with any prerogative, or any portion of the public domain, will not be presumed in the absence of clear and express words denoting such intent.

Lands below high-water mark of navigable waters, therefore, will not pass by a patent from the sovereign power, unless actually included in the expressed metes and bounds of the grant.

*It seems,* however, the provisions of colonial charters are to be liberally construed, whenever necessary to accomplish the purposes of the grant.

The tenure created by royal grants was not affected by the change in the common law wrought by the statute of *quia emptores* (18 Edward I), and every conveyance emanating from the Crown, reserving rent, notwithstanding said statute, still created a rent service and involved the possibility of forfeiture.

A patent from the Crown of Great Britain, issued in 1666 and confirmed in 1687, creating the manor of Pelham, conveyed a tract of land upon the mainland bounded by Long Island sound, with all the islands in the sound not previously granted or disposed of, "lying before the tract upon the mainland." In an action of ejectment to recover land under water adjoining one of said islands, *held,* that the title to the lands in question did not pass to the patentee, and this, although the patent granted a manorial franchise, with administrative and judicial powers; that the bestowal of these powers did not enlarge the property rights of the patentee; and that, therefore, a patent granted by the Crown in 1763, which included the lands in question, was not overreached or affected by the prior patents.

*Martin* v. *Waddell* (16 Pet. 369), distinguished.

The patent of 1763 provided for the payment of a quit-rent. *Held*, that the patent was liable to forfeiture in case of non-payment of the rent and that the interest of the Crown in the lands granted, and the rights to the rents reserved, having become vested in the people of the state, the state had authority to terminate the grant for failure to discharge the rent service imposed; also that the state in seeking to avail itself of the grantee's delinquency was not restricted in the choice of remedies, but could pursue any course which clearly evinced an intention to reassert title and resume possession; and that any legislative assertion of ownership was the equivalent of an inquest of office at common law, finding the fact of forfeiture and adjudging a restoration of the estate.

Default having been made in the payment of the quit-rents reserved by said patent of 1763, pursuant to the authority given by the act of 1819 (Chap. 222, Laws of 1819) and the various supplemental statutes (Chap. 225, Laws of 1824; chap. 251, Laws of 1825) authorizing the state comptroller to advertise and sell all lands chargeable with quit-rents which were in arrear, and if unredeemed for two years after sale to convey the same to the purchaser, the comptroller sold and conveyed the lands covered by the patent. *Held*, that the legislative purpose to enforce the forfeiture and resume possession was clearly manifested by said acts, and the purpose was effectually accomplished by the proceedings of the comptroller; and that the comptroller's deed established *prima facie* the existence of the jurisdictional facts authorizing the sale.

*It seems* a mere assertion by the legislature of a forfeiture of a patent, for condition broken, will not conclude the patentee or those in privity of estate with him from showing that he was not in default, and so, that no forfeiture was legally enforcible.

Such a claim or defense, however, is only available to those deriving title under the patent and cannot inure to the benefit of strangers to the title.

The comptroller's deed recited a compliance with all the statutory provisions on the subject. *Held*, that the deed being regular and valid on its face, extrinsic evidence was not required to render it admissible as the act of the state.

A deed by a public officer in behalf of the state, although the officer is the nominal party, is a deed of the state.

The issuing of a patent for lands by officers of the state having authority to issue it, is presumptive evidence that all the prescribed preliminary steps have been taken, and it may not be impeached collaterally upon trial of an action of ejectment.

The distinction between the rule in such case and that governing where title rests upon a tax sale, pointed out.

It appeared that in 1836, when the comptroller's deed was executed, there were two piers running from the upland on the island down to below high-water mark. These structures were not claimed or used exclusively by any individual proprietor, but were open to public use for fishing, landing of boats, etc., and also as water fences to restrain cattle.

*Held,* that no actual individual occupancy of the land under water or any material portion of it was shown, so as to require notice under the provision of the act of 1819 (§ 22), providing that if at the time of a conveyance by the comptroller, the lands are in the actual possession and occupancy of any person, a written notice of the sale and conveyance must be served on such person, and requiring the purchaser, in order to complete his purchase, to show by due proof that such notice has been given.

The defendant P. claimed title by adverse possession. It appeared that C., his grantor, went into possession of a small portion of the upland in 1861 which was used as a shipyard. Two marine railways, each ten or twelve feet wide, extended into the water about 200 feet. In 1863 C. procured from the commissioners of the land office, a patent of the land under water upon which the railways were built, and in 1865, built a wharf at the foot of a street. It did not appear that those structures were kept up or used continuously for twenty years. They were of a temporary character and designed simply as means of access between the upland and the navigable waters. When P. purchased, they had rotted down and been washed away. *Held,* that no permanent appropriation of the land by C. was shown and the evidence failed to establish adverse possession; that plaintiff, who claimed under the comptroller's deed, having established a legal title thereunder, was presumed to have been in possession within the time prescribed by law, and the occupation by another was to be deemed to have been in subordination to his title (Code Civ. Pro. § 368), and so the burden was thrown upon said defendant of proving an actual adverse and exclusive possession.

The patent of 1763 contained a provision to the effect that it should not prohibit or in any wise prejudice or exclude any person from any right or privilege he might lawfully have enjoyed had the grant not been made, *i. e.,* bringing and anchoring vessels or boats on the premises granted, or fishing, etc., except upon such parts thereof as shall be covered by wharves or buildings erected by the patentee, his heirs or assigns. The comptroller's deed simply conveyed the property so granted by the Crown. *Held,* that said deed did not vest in the grantor any of the rights so reserved by the Crown and which passed to the people of the state as successors of the royal power, not by means of the forfeiture of the grant.

Reported below, 63 Hun, 169.

(Argued February 10, 1893; decided April 11, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made February 27, 1892, which affirmed a judgment in favor of plaintiff, entered upon a verdict directed by the court.

This was an action of ejectment.

The facts, so far as material, are stated in the opinion.

*George A. Black* for appellant. In an action of ejectment, the plaintiff can succeed only the strength of his title. (*Roberts* v. *Baumgarten*, 110 N. Y. 385.) Palmer's patent being a grant in fee with an annual rent of five shillings reserved, and no promise to pay or clause of re-entry, the plaintiff's contention is that a condition subsequent is to be implied, and that on failure to pay, as there could be no action of covenant or debt, and no distress (as the land was under water), and no action of ejectment (as there was no clause of re-entry), that a forfeiture to the People, as successors to the Crown, ensued upon a failure to pay rent, and that such forfeiture has been effected, not by a judicial determination that it existed, but by reason of the legislation as to quit-rents. This is untenable. (*Craig* v. *Wells*, 11 N. Y. 320; *Coleman* v. *Portbury*, 39 L. J. [Q. B.] 136; *Cutler* v. *Wright*, 22 N. Y. 472; *Van Rensselaer* v. *Hays*, 19 id. 84.) Plaintiff's contention is that the People by legislation forfeited the Palmer patent and acquired a complete ownership of the land embraced in it, and sold the unrestricted and absolute fee to Hunter. This is erroneous. (*Beekman* v. *Bingham*, 5 N. Y. 368; *Rathbone* v. *Hooney*, 58 id. 468; *Guest* v. *Brooklyn*, 69 id. 514; *Thompson* v. *Burhans*, 61 id. 60.) The sale was of the Palmer patent. (Laws of 1819, chap. 222, § 11; *De Peyster* v. *Michael*, 6 N. Y. 506.) There was neither action of covenant, action of debt, distress, action for use and occupation, writ of cessavit, nor action of ejectment by which the forfeiture was adjudged and determined. (Taylor's Landl. & Ten. §§ 371, 635; *Thomas* v. *Sylvester*, L. R. [8 Q. B.] 368; *De Lancey* v. *Ganong*, 9 N. Y. 20; *Wigg* v. *Wigg*, 1 Atk. 383; *Doe* v. *Watt*, 1 M. & R. 694.) The sale of the Palmer patent was void. (*People* v. *Schermerhorn*, 19 Barb. 558; *Thompson* v. *Burhans*, 61 N. Y. 66; *Bagley* v. *Bowe*, 105 id. 179; *Westbrook* v. *Wiley*, 47 id. 459; *Beach* v. *Mayor*, etc., 45 How. Pr. 368; *Munroe* v. *Merchant*, 26 Barb. 402.) To amount to an adverse possession under color of title, the plaintiff must establish the conditions which the law, as it existed when she commenced her adverse possession, exacted. (*Thompson* v. *Burhans*, 79 N. Y. 96.) The palpable device resorted to by Hunter of leasing to his servant,

Leviness, is entitled to just as much consideration as the strictest rules allow, and no more. (*Thompson* v. *Burhans*, 79 N. Y. 101.) The plaintiff took whatever title Hunter had, subject to the trust imposed on Palmer. (Laws of 1825, chap. 251.) The court should have nonsuited the plaintiff as requested. (*Dwight* v. *Ins. Co.*, 103 N. Y. 558; *Hall* v. *Stephens*, 116 id. 210; *Bulger* v. *Rosa*, 119 id. 464.) Besides showing that plaintiff had no title, defendant established a superior title to the *locus* in himself. (*Roe* v. *Strong*, 119 N. Y. 322; *Price* v. *Brown*, 101 id. 671.) If the Palmer grant was forfeited, then the title to these lands under water must be conveyed by the land commissioners, and by them only, to the owners of the upland, and they have so conveyed to Carll and Piepgras. (Laws of 1784, chap. 6; Laws of 1790, chap. 53, § 5; Laws of 1801, chap. 69; Laws of 1786, chap. 67; *E. G. B. M. Co.* v. *B. S. & Co.*, 129 N. Y. 155.)

*Martin J. Keogh* for appellant. The fee of the premises in question was included in and conveyed by the Pell patents and any subsequent grant from the Crown was void. (*People* v. *Van Rensselaer*, 9 N. Y. 261; *Morton* v. *Waddell*, 16 Peters, 369; *Trustees Brookhaven* v. *Strong*, 60 N. Y. 56; *Roe* v. *Strong*, 107 id. 350.)

*Walter D. Edmonds* for respondent. It was competent for the state to convey these lands under water to plaintiff's father, and the patent to him confers title sufficient to sustain ejectment against all trespassing riparian neighbors. (Laws of 1887, chap. 584; *E. G. B. M. Co.* v. *B. I. Works*, 129 N. Y. 155, 159; *Lansing* v. *Smith*, 8 Cow. 146; *Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *People* v. *Vanderbilt*, 26 id. 287, 292; *People* v. *Mauran*, 5 Den. 389; *Morgan* v. *Moore*, 3 Gray, 319; *Tilmis* v. *Marsh*, 67 Penn. St. 507; *Bakeman* v. *Talbot*, 31 N. Y. 371.) The patent to Hunter of April 5, 1836, being regular and valid on its face, and of earlier date than any patent under which defendant claims, cannot be impeached or qualified in this action; least of all by proof that another than Hunter was owner of the adjacent upland,

or had riparian rights over the lands conveyed. (*N. Y. C. & H. R. R. R. Co.* v. *Aldridge*, 32 N. E. Rep. 50; *People* v. *Mauran*, 5 Den. 389.) But plaintiff need not rest her case upon the conclusiveness of her patent, because all the adjacent upland owners' riparian rights and easements have in this case been extinguished through merger. (*Day* v. *Town of New Lots*, 107 N. Y. 148; *Stilwell* v. *Carpenter*, 62 id. 639; *Smith* v. *Roberts*, 91 id. 470, 475; *In re Gilbert*, 104 id. 200, 212; *Roberts* v. *Jackson*, 1 Wend. 478; *James* v. *Morey*, 2 Cow. 246, 284, 300; Washb. on Ease. 684, 517.) Disregarding its unimpeachability, plaintiff has, upon the merits, through the patent to Hunter, a good and valid title in fee simple absolute to the premises in suit. (*Westbrook* v. *Willey*, 47 N. Y. 457; *Doughty* v. *Hope*, 3 Den. 594; *Varick* v. *Talman*, 2 Barb. 116; *Van Rensselaer* v. *Reud*, 26 N. Y. 558, 576; *Van Rensselaer* v. *Snyder*, 13 id. 299; *Van Rensselaer* v. *Hays*, 19 id. 68; *De Peyster* v. *Michael*, 6 id. 500, 501; *Jackson* v. *Hogeboom*, 11 Johns. 163; *Van Wyck* v. *Knevals*, 106 U. S. 368; *People* v. *Mauran*, 5 Den. 389; *Coleman* v. *Anderson*, 10 Mass. 105; *Thompson* v. *Burhans*, 61 N. Y. 67; *Striker* v. *Kelly*, 2 Den. 330; *Beekman* v. *Bigham*, 1 Seld. 366; *Pejepscut* v. *Ransom*, 14 Mass. 145.) Assuming, for argument only, that neither the comptroller's deed nor the subsequent adverse possession is sufficient to protect her title, nevertheless plaintiff is entitled to recover herein on the sole ground of prior possession. (*Hunter* v. *Starin*, 26 Hun, 529; *Thompson* v. *Burhans*, 79 N. Y. 93–97; *New Shoreham* v. *Ball*, 1 East. Rep. 14; *Wheeler* v. *Spinola*, 54 N. Y. 377; Wood on Lim. of Act. 259.) Defendant is estopped from denying validity of plaintiff's title under the state's prior deed to Hunter. (*Wood* v. *Seeley*, 32 N. Y. 112, 116; *Fonda* v. *Sage*, 48 id. 180; *Favil* v. *Roberts*, 50 id. 226; *Sherman* v. *McKeon*, 87 id. 266; *Barnard* v. *Campbell*, 55 id. 464, 465.) The remaining matters of defense relied upon to defeat plaintiff's title are plainly insufficient. These are : The contention that plaintiff's title is charged with a trust for benefit of owners of upland; defendant's adverse possession founded on written

instrument; prior conveyance of premises by Pell's patent; unconstitutionality of the Quit-rent Act of 1819, and acts amendatory thereof. (*C. & S. L. R. R. Co.* v. *Valentine*, 19 Barb. 484; *Roe* v. *Strong*, 107 N. Y. 350; *Rogers* v. *Jones*, 1 Wend. 237; *Gould* v. *James*, 6 Cow. 369; *Trustees, etc.*, v. *Strong*, 60 N. Y. 56; *Cheney* v. *Gupthill*, 2 Hann. 379; *Robins* v. *Ackerly*, 91 N. Y. 98; *Martin* v. *Rector*, 118 id. 476, 479; *Van Rensselaer* v. *Ball*, 19 id. 100; *Van Rensselaer* v. *Snyder*, 13 id. 299; *Van Rensselaer* v. *Slingerland*, 26 id. 580, 585.) There were no errors by the court on the trial at the Circuit. (*Jackson* v. *Estey*, 7 Wend. 148; *Cagger* v. *Lansing*, 64 N. Y. 417; *Stuart* v. *Simpson*, 1 Wend. 376; *Rudd* v. *Davis*, 3 Hill, 287; *Dwight* v. *Ins. Co.*, 103 N. Y. 341, 359; Tyler on Boundaries, 47; *Palmer* v. *Hicks*, 6 Johns. 133; *Murphy* v. *City of Brooklyn*, 98 N. Y. 642; *Wheeler* v. *Spinola*, 54 id. 377, 387; *Miller* v. *Downing*, Id. 631; *Lane* v. *Gould*, 10 Barb. 254; Gould on Waters, § 37; *Atty.-Gen.* v. *Chambers*, 4 De G. & J. 55; *Thomas* v. *Marshfield*, 10 Pick. 364; 13 id. 240; *Hand* v. *Ballou*, 12 N. Y. 542; *Muller* v. *McKesson*, 73 id. 195, 198; *Spiridon* v. *Watson*, 18 J. & S. 494; *Ormes* v. *Dauchy*, 82 id. 443; *Dillon* v. *Cockraft*, 90 id. 649; *Stratford* v. *Jones*, 97 id. 586; *Johnson* v. *Trask*, 40 Hun, 415; *Mayor, etc.*, v. *Sands*, 39 id. 519; *Provost* v. *McEncroe*, 102 N. Y. 650; *Leggett* v. *Hyde*, 58 id. 272; *Hagaman* v. *Burr*, 19 J. & S. 423; *Sutter* v. *Vanderveer*, 122 N. Y. 652; *Boos* v. *Ins. Co.*, 64 id. 236, 242; *Ehrman* v. *Rothschild*, 22 Hun, 273; *H. P. Co.* v. *Hunt*, 9 N. Y. S. R. 31–33; *Outter* v. *Morris*, 41 Hun, 575.)

*John Hunter, Jr.*, for respondent. The question of riparian ownership does not arise, and even assuming that it does, it is submitted, first, that the riparian owner received his so-called riparian rights and thereafter forfeited them; second, that after such forfeiture the respective rights of sovereign and riparian owner having become merged, the sovereign power could convey the land under water to persons not owners of adjoining upland. (*Mayor, etc.*, v. *Hart*, 95

N. Y. 493 ; *N. Y. C. & H. R. R. R. Co.* v. *Aldridge,* 32
N. E. Rep. 52, 53 ; *People ex rel.* v. *Jones,* 112 N. Y. 598;
*Erhardt* v. *Hogaboom,* 115 U. S. 67 ; *French* v. *Fyan,* 93 id.
169 ; *Steel* v. *Smelting Co.,* 106 id. 447 ; *Stilwell* v. *Carpen-
ter,* 62 N. Y. 639 ; *Porter* v. *Waring,* 69 id. 255 ; *James* v.
*Morey,* 2 Cow. 246 ; *Schermerhorn* v. *Merrill,* 1 Barb. 512;
*Reed* v. *Latson,* 15 id. 9 ; *People* v. *N. Y. & S. I. F. Co.,*
68 N. Y. 71 ; *Smith* v. *Roberts,* 91 id. 470 ; *In re Gilbert,*
104 id. 200.)　　The patent by the people of the state of New
York to Elias D. Hunter, executed pursuant to chapter 222
of the Laws of 1819, and bearing date April 5, 1836, passed a
good and valid title in fee simple absolute to the premises in
suit. (Laws of 1819, chap. 222 ; *De Peyster* v. *Michael,* 6 N.
Y. 467 ; *Van Rensselaer* v. *Hays,* 19 id. 68 ; *Hosford* v.
*Ballard,* 39 id. 151 ; Gerard on Tit. [3d ed.] 133, 134 ;
*People* v. *Van Rensselaer,* 9 N. Y. 291 ; *People* v. *Clark,*
Id. 349 ; *Van Rensselaer* v. *Read,* 26 id. 558 ; *Van
Rensselaer* v. *Snyder,* 13 id. 299 ; *Cruger* v. *McLaury,* 41 id.
221 ; *Central Bank* v. *Heydorn,* 48 id. 260 ; *Van Wyck* v.
*Knevals,* 106 U. S. 368 ; *People* v. *Mauran,* 5 Den. 389 ;
*Thompson* v. *Burhans,* 61 N. Y. 67 ; *Murphy* v. *City of
Brooklyn,* 98 id. 642 ; *Steele* v. *Burhans,* 84 id. 638 ; *Col-
man* v. *Anderson,* 10 Mass. 105 ; *Gildart* v. *Gladstone,* 11
East, 685 ; *D., etc., R. R. Co.* v. *Litchfield,* 23 How. [U. S.]
88 ; *Jackson* v. *McClallen,* 8 Cow. 295 ; *De Lancey* v. *Ganong,*
9 N. Y. 20 ; *Jackson* v. *Hogeboom,* 11 Johns. 163 ; *Henderson* v.
*C. C. & C. Co.,* 140 U. S. 33 ; *Prout* v. *Roby,* 15 Wall. 476 ;
*Conner* v. *Bradley,* 1 How. [U. S.] 217 ; *Van Rensselaer* v.
*Ball,* 19 N. Y. 107.)　　The appellant is estopped from deny-
ing that the respondents have acquired a good title and can-
not be permitted to impeach a grant made by the state of New
York under which they both claim and overreaching his own
title. (*Peck* v. *Burr,* 10 N. Y. 297 ; *Walrath* v. *Redfield,*
18 id. 461 ; *People* v. *Society, etc.,* 2 Paine C. C. 545 ; Bisp-
ham Eq. Juris. §§ 280, 294 ; *Moseley* v. *Moseley,* 15 N. Y.
336 ; *Campbell* v. *Hall,* 16 id. 578 ; *Wood* v. *Seeley,* 32 id.
116 ; *Sherman* v. *McKeon,* 38 id. 268 ; *Barnard* v. *Campbell,*

55 id. 464, 465; *Fonda* v. *Sage,* 48 id. 180; *Favill* v. *Roberts,* 50 id. 226; *Mills v. Hoffman,* 92 id. 190; *Mut. L. I. Co.* v. *Corey,* 31 N. E. Rep. 1095; *Trevivan* v. *Lawrence,* 1 Salk. 276; *Carver* v. *Jackson,* 4 Pet. 1; *Shelby* v. *Wright,* Willes, 9.) The deed from the state to Elias D. Hunter in 1836 was at least a conveyance of the vested interest in the land originally reserved to the Crown, which, in the absence of any title in the appellant, coupled with Hunter's thirty years' possession thereunder, is sufficient to justify the verdict given at Circuit. (1 R. S. 739, § 143; *People* v. *Trinity Church,* 22 N. Y. 47; *Hunter* v. *Starin,* 26 Hun, 529; *McRoberts* v. *Bergman,* 132 N. Y. 73, 84; *Thompson* v. *Burhans,* 79 id. 96; *Smith* v. *Burtis,* 6 Johns. 197.) The patent by the governor-general of the province of New York to John Pell, bearing date the 20th of October, 1687, did not cover the premises in question, and the fee to the same was in the Crown at the time of the conveyance to Benjamin Palmer on May 27, 1763. The state, as successor to the Crown, took the public domain as an absolute owner and was under no obligation to hold the public lands under water in trust for the benefit of owners of the adjoining uplands. (*Furman* v. *City of New York,* 5 Sandf. 33; *Gould* v. *H. R. R. R. Co.,* 6 N. Y. 522; *People* v. *Tibbits,* 19 id. 523; *People* v. *Canal Appraisers,* 33 id. 478, 486, 487; *Trustees, etc.,* v. *Strong,* 60 id. 65; *People* v. *N. Y. & S. I. F. Co.,* 68 id. 78; *Langdon* v. *Mayor, etc.,* 93 id. 144, 156; *Mayor, etc.,* v. *Hart,* 95 id. 443; *Chad* v. *Tilsed,* 2 B. & B. 403; *Livingston* v. *Ten Broeck,* 16 Johns.) The proceedings on the part of the appellant subsequent to the year 1865, are insufficient to establish a title by adverse possession as against the real owner. (Code Civ. Pro. § 370; *Thompson* v. *Burhans,* 79 N. Y. 99; *Bliss* v. *Johnson,* 94 id. 242; *Wheeler* v. *Spinola,* 54 id. 377; *Roe* v. *Strong,* 107 id. 359.) The verdict was properly directed. (*Cagger* v. *Lansing,* 64 N. Y. 427; *Dwight* v. *G. L. Ins. Co.,* 103 id. 358; *Bulger* v. *Rosa,* 119 id. 463; *Mayer* v. *Dean,* 115 id. 559; *Rowland* v. *Hegeman,* 59 id. 643; *Tenny* v. *Berger,* 93 id. 531; *Thompson* v. *Burhans,* 61 id. 67; *Daniels* v.

*Smith*, 130 id. 696.) The act of 1819 under which the premises in suit were sold to respondent's ancestor, was constitutional. (*Martin* v. *Rector, etc.*, 118 N. Y. 476 ; *Van Rensselaer* v. *Ball*, 19 id. 100 ; *Van Rensselaer* v. *Snyder*, 13 id. 299 ; *Van Rensselaer* v. *Slingerland* 26 id. 580, 585 ; *People* v. *Van Rensselaer*, 9 id. 291.)

MAYNARD, J.    The plaintiff and the defendant John Hunter have recovered in ejectment from the appellant the possession of a strip of land under water adjacent to Minnefords, or City island, in Long Island sound, extending into the sound four hundred feet at right angles to ordinary high-water mark. The premises are a part of a tract of land under water of the same width, comprising about one hundred and forty-five acres, completely surrounding the island, and described in letters patent issued to Benjamin Palmer, May 27, 1763, in the name of the Crown of Great Britain, by Robert Monckton, captain-general and governor-in-chief of the province of New York.    The respondents' title and right of recovery depend, in the first instance, upon the operation and effect of this grant, the *habendum* clause of which provides that the lands shall be held by Palmer in free and common socage, as of the manor of East Greenwich, in the county of Kent, yielding, rendering and paying therefor yearly, and every year forever, to the king of Great Britain, at his custom house in New York city, to his collector or receiver-general, there for the time being on Lady Day, the annual rent of five shillings sterling, in lieu and stead of all other rents, services, dues, duties and demands whatsoever, for the premises granted, and every part and parcel thereof ; and also upon the validity of a comptroller's deed of the same, executed in 1836 to the devisor of the respondents under proceedings had by the authority of the state for a forfeiture of the patent for non-payment of the quit-rents.

Many objections are urged against this recovery by the appellant's counsel, with great learning and ability, which demand the most serious attention, and which we will con-

sider in the order· in which they arise in the development of the respondents' title. *First.* It is insisted that the royal grant to Palmer is overreached by another patent from the Crown, issued in 1666 to Thomas Pell and confirmed in 1687 to his nephew John Pell, creating the manor of Pelham, comprising a large territory upon the mainland oppo› site Minneford island, and including the island, and by virtue of which it is claimed that the title to the land under water about the island became vested in the patentee. It must be admitted that if the patent to Pell was an ordinary conveyance, even from the sovereign power, it would not extend beyond high-water mark, and that lands below that point would not pass by the deed, unless actually included in the expressed metes and bounds of the grant. (*Rogers* v. *Jones,* 1 Wend. 237; *Gould* v. *James,* 6 Cowen, 369; *Cheney* v. *Guptill,* 2 Hannay, N. B. 379; *Trustees of Brookhaven* v. *Strong,* 60 N. Y. 56; *Roe* v. *Strong,* 107 id. 358.) The descriptive part of the instrument is limited to the mainland and the islands in the sound opposite. It is a conveyance of a tract upon the mainland bounded on the south by Long Island sound, with all the islands in the sound not previously granted or disposed of, "lying before the tract upon the mainland," which extends inland eight English miles, with the same breadth in the rear "as it is along by the sound." The burden of proof is upon those who claim below high-water mark, and it has been held that a private grant, which included an arm of the sea with all islands, ponds, ways, waters, water courses, havens and ports, was insufficient at common law to convey the soil between high and low-water mark. (Gould on Wat. 69; *East Haven* v. *Hemingway,* 7 Conn. 186, 200; *Middletown* v. *Sage,* 8 id. 221; *Jackson* v. *Porter,* 1 Paine C. C. 457; *Com.* v. *Roxbury,* 9 Gray, 457, 478, 493.)

It is true that the patent to Pell was also a grant of a manorial franchise, with administrative and judicial powers, such as the establishment of a court leet and a court baron, and the learned counsel, whose brief is specially devoted to this point, takes the ground that the conveyance must be

regarded as a public grant, which includes within the scope of its operation all the lands under water, to which the jurisdiction of the lord of the manor extended. In some measure the right of local self-government was given, and it was declared in the deed that the lands and premises conveyed should forever thereafter, "in all cases, things and matters be deemed, reputed, taken and held as an absolute intyre, infran-chised towneshipp, mannor and place of itselfe in this government," and that it should hold and enjoy the same privileges and immunities as any town within the colony. This bestowal of political rights and powers did not, however, enlarge the property rights of the patentee. They were franchises of a public character to be held and exercised by him as the repre-sentative of the Crown or of the colonial government. It may be admitted that civil and criminal processes issued by him might be lawfully executed upon the adjacent waters, but the proprietorship of the soil under the water would not follow as an incident of this power. The right of jurisdiction and the right of property must not be confounded. The former could be restricted or even abrogated by the authority which granted it and became subject to the control of the state, upon the adoption of the first Constitution; the latter was a matter of private ownership, of which the proprietor could not be divested, except by his own act or by due process of law.

The case of *Martin* v. *Waddell* (16 Peters, 369), is cited at great length by counsel, but we think it is destructive of the appellant's claim in this respect. It involved the construction of the grant made by Charles 2nd to the Duke of York, by means of which authority was given to establish a colonial government over a vast extent of territory bordering upon the sea coast. It was there held that the patentee became vested with the title to the lands under water, not, however, in his private right, but as the representative of the Crown, and as a part of the royal prerogatives, or *jura regalia*, which it was presumed he would administer for the public good. While these colonial charters were in the nature of grants, and were conferred by the king as proprietor, yet as they respectively

created governments, they were not construed as his other
grants were, that is, as excluding the adjacent waters, but as
including them, and thus the government of the respective
colonies had ample authority to alter the established law with
regard to their tide waters, or to grant an exclusive property
therein, at their discretion. (Angell on Tid. Wat. 37, 38.)
The different rule of construction to be applied in the two
classes of cases is defined with great clearness and emphasis
by Ch. J. TANEY.

The grant is to be applied with strictness, where it is the
gift of some prerogative right to be held by the citizen as a
franchise, and which becomes private property in his hands.
It will not be presumed that the sovereign power intended to
part with any of its prerogatives, or with any portion of the
public domain, unless clear and express words are used to
denote the intention. But colonial charters were designed to
be the instruments upon which the institutions of a great
political community were to be founded; and their provisions
must be liberally interpreted, whenever necessary to accom-
plish the purpose of their creation.

There was no departure from these principles of construc-
tion in *Trustees of Brookhaven* v. *Strong* (60 N. Y. 59), and
the other cases involving the jurisdiction of the Long Island
towns over the adjacent tide waters, to which our attention
has been called. In the *Brookhaven* case, the right of the
town to a portion of the waters of the Great South bay, and
the lands thereunder, was upheld because they were expressly
included within the boundaries of the grant, and their con-
trol was a part of the royal prerogatives conferred, and the
authority of the town over them had been recognized by both
colonial and state legislation.

It must, therefore, be held, we think, that the Crown did
not part with the title to these lands when the manor of Pel-
ham was created, and that it became vested in Palmer by the
grant to him in 1763.

*Second.* The patent to Palmer was liable to forfeiture, for a
failure to pay the quit-rent reserved; and the several acts of

the legislature authorizing the sale of the lands because the rent was in arrear, were sufficient to terminate the estate of the patentee, and reinvest the sovereign with the original title. Notwithstanding the grant, the king still had the reversion, now called the escheat, and there was the obligation of fealty on the part of the grantee, which if broken, would also cause the estate to revert, and in all such cases, if rent was reserved, it became a rent service, and the estate granted a qualified or conditional fee.

In the feudal economy, rent had a two-fold quality. It was regarded as something issuing out of the land, as a compensation for the possession; and also as an acknowledgment by the tenant to the lord, of his fealty or tenure. A quit-rent was so called because the tenant thereby went quit and free of all other services (1 Woodfall on L. & T. 375, 6, 7). In case of a rent service, its payment was a condition subsequent implied in law, and essential to be observed, in order to insure the continuance of the grant. After the enactment of the statute of *quia emptores* in the 18 of Edward I, no such condition would be implied in a grant in fee, between individuals. Every freeman might then sell his lands at pleasure; the system of subinfeudation was destroyed, and feudal restraints upon alienation abolished. What would have before been regarded as a rent service, because of the implied obligation to render it, would in subsequent grants become a rent charge or a rent seck, and a failure to pay would not of itself work a forfeiture of the estate. But as the king is not bound, unless the statute is made by express terms to include him, the tenure created by royal grants was not affected by this change in the law; and every conveyance, emanating from the Crown, reserving rent, still created a rent service and involved the possibility of forfeiture. For a breach of the condition, the king might by inquisition have the estate of the tenant declared at an end, resume possession, and his original seizin would be restored unaffected by the previous demise. The patent to Palmer was, therefore, burdened with this condition, and the interest of the Crown

in the lands granted, with the right to the rents reserved, and to re-enter for non-payment became vested at the Revolution, in the people of the state, who it is declared in the Consti-' tutions of 1777 and 1821, have succeeded to all the rents, prerogatives, privileges, forfeitures, debts, dues, duties and services, formerly belonging to the parent government, with respect to any real property within the jurisdiction of the state.    Thereafter the people in their sovereign capacity, were the lord paramount; and had authority to terminate the grant to Palmer, for failure to discharge the rent service imposed by it.

The state was not restricted in the choice of remedies, if it sought to avail itself of the grantee's delinquency, so long as the course pursued clearly evinced an inten- tion to reassert title, and resume possession.   The mode in which it should be done was subject to the legislative will. It might be the result of an authorized judicial investigation, or by taking possession directly under the authority of the government, without any preliminary proceeding.   A legisla- tive act directing the appropriation of the land, or that it be offered for sale or settlement, or any other legislative assertion of ownership, is the equivalent of an inquest of office at com- mon law, finding the fact of forfeiture, and adjudging the restoration of the estate on that ground.   This was substan- tially the rule laid down by NELSON, J., in *U. S.* v. *Repen- tigny* (5 Wall. 267), in the case of a grant by the French crown, where the Federal government had re-entered for con- dition broken, and reiterated in many subsequent cases. (*Schulenberg* v. *Harriman,* 21 Wall. 44; *Van Wyck* v. *Knevals,* 106 U. S. 368; *St. Louis, etc., R. Co.* v. *McGee,* 115 id. 469; *Bybee* v. *Oregon & Cal. R. R. Co.,* 139 id. 675.)

By chapter 222 of the Laws of 1819, the comptroller was directed, as soon thereafter as might be practical, to advertise and sell all lands chargeable with quit-rents, upon which the rent might be in arrear, on some day to be named by him not less than twelve months from the date of notice, and, if the land sold should remain unredeemed for two years after the

sale, to convey the same to the purchaser by deed, under his hand and seal of office, and witnessed by the deputy comptroller. By various supplemental statutes, the sale was postponed until the first Tuesday in March, 1826, when, by chapter 251 of the Laws of 1825, the comptroller was directed to commence the sale, having previously given notice thereof in at least one public newspaper in the county where the lands were situated, and to sell only for such sums as the owners were required by law to pay as commutation for the rents reserved, which by the act of 1824 (Chap. 225) was fixed at two dollars and fifty cents for each shilling, if paid before May 3, 1825, and with an addition of ten per cent if paid thereafter. Pursuant to this authority, the lands described in the patent to Palmer were sold by the comptroller in 1826, and bid off by Teunis Van Vechten, and a certificate of sale issued to him by the comptroller. Van Vechten assigned his bid and certificate to Elias D. Hunter, the respondent's devisor, to whom the comptroller executed a deed in due form on April 5, 1836. The legislative purpose, as indicated in these enactments, to enforce a forfeiture and resume the possession and control of the estate granted to Palmer, is, we think, too clear and certain to admit of question. This purpose was effectually accomplished by the proceedings of the comptroller taken in conformity therewith. We do not hold that a mere assertion by the legislature of a forfeiture for condition broken will conclude the patentee, or those in privity of estate with him, from showing that he was not in default, and that no rent was in fact due, and that, therefore, there could have been no forfeiture legally enforceable, but such a claim or defense can only be available to those deriving title under the patent, and cannot inure to the benefit of strangers to the title. It will be presumed that the sovereign authority did not act without knowledge or proof of the existence of a cause of forfeiture, and, until overthrown, this presumption will be sufficient to support their action.

   *Third.* The comptroller's deed to Hunter established, *prima*

*facie*, the existence of the jurisdictional facts authorizing a sale of the lands. It recited a compliance with all of the provisions of the law upon the subject, and being regular and valid upon its face, extrinsic evidence was not required in order to render it admissible as the act of the state. A deed by a public officer in behalf of a state is the deed of the state, although the officer is the nominal party. (Gerard on Titles [3d ed.], p. 18; *Sheets* v. *Selden*, 2 Wall. 177.) The rule is firmly established that the issuing of a patent by the officers of a state, who have authority to issue it, upon compliance with certain conditions, is always presumptive evidence of itself that the previous proceedings have been regular, and that all the prescribed preliminary steps have been taken; and the recitals in it are evidence against one who claims under the original owner by a subsequent conveyance, or does not pretend to claim under him at all, and the grant cannot be impeached collaterally in a court of law upon the trial of an ejectment. (3 Wash. on R. P. [5th ed.] p. 205; *People* v. *Mauran*, 5 Den. 389; *People* v. *Livingston*, 8 Barb. 277; *Steiner* v. *Coxe*, 4 Penn. St. 28; *Hill* v. *Miller*, 36 Mo. 182; *U. S.* v. *Arredondo*, 6 Pet. 691; *Bagnell* v. *Broderick*, 13 id. 436; *E. G. Blakeslee Mfy. Co.* v. *Blakeslee*, 129 N. Y. 155, 160.)

It was said by the Federal Supreme Court in the *Arredondo* case, which was a Spanish grant (p. 727), that "the public acts of public officers, purporting to be executed in an official capacity, and by public authority, shall not be presumed to be an usurped but a legitimate authority, previously given or subsequently ratified. If it was not a legal presumption, that public and responsible officers, claiming and exercising the right of disposing of the public domain, did it by the order and consent of the government in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite in this country."

The rule which governs where the title rests upon a tax sale has no application. In such cases the state proceeds in a summary way to seize and appropriate the property of the citizen

*in invitum*, and the sale and conveyance are but steps in the proceeding, which must be shown to have been duly instituted and regularly prosecuted, or the attempted confiscation will fail, unless there is some statute which makes the deed presumptive or conclusive evidence of regularity. In the present case the state was engaged in the sale of its own lands. It was not restricted in the selection of the mode of procedure. The requirements which it imposed were either for its own protection, or an act of grace to the patentee, to afford him an opportunity to redeem from the forfeiture, which the state could, at its option, make absolute. This distinction has been repeatedly pointed out. In *Boardman* v. *Reed* (6 Pet. 342), it was said by McLEAN, J.: "That when an individual claims land under a tax sale, he must show that the substantial requisites of the law have been observed; but this is never necessary when the claim rests on a patent from the commonwealth." In the *People* v. *Mauran* (*supra*), which like the case at bar was ejectment on a grant of lands under water, McKISSOCK, J., said: "The principles governing here have no analogy to the rules applicable to the cases to which we were referred on the argument, such as purchases under sales for taxes and the like."

*Fourth.* The 22d section of the act of 1819 provided that if, at the time of the conveyance, the lands were in the actual possession and occupancy of any person, the purchaser shall serve upon the occupant a written notice of the sale and conveyance, stating the amount of the consideration, and that unless paid, with fifty per cent added, into the state treasury for the benefit of the purchaser within six months from the service of the notice, the conveyance will become absolute, and the occupant and all others interested in the lands be forever thereafter barred of all right or title to the same.; and that it should be necessary for the purchaser, in order to complete his title, to show by due proof that such notice had been given, and by the certificate of the comptroller, that payment had not been made as required in the notice.

It is insisted that these premises were actually occupied in

1836, when the deed to Elias D. Hunter was executed, and that in the absence of proof that the required notice was given the plaintiff's title is fatally defective. The evidence in regard to occupancy is substantially undisputed, and hence it becomes a question of law whether it was sufficient to bring the case within the provisions of the statute requiring notice. The testimony of the principal witness for the appellant, who was but nine years of age in 1836, was to the effect that there were two piers, one on the southwest, and the other on the west end of the island, both running down to below low-water mark, built of stone, one about one hundred feet in length running out to a big rock, and about fifteen feet wide, and the other extending fifty or sixty feet out, and from six to eight feet wide. The father of the witness owned the upland on that part of the island, but he did not build the docks or keep them in repair, and the witness states that "They were quite old, ruinous, broken-down stone piles," and that the larger one was evidently built for the purpose of reaching the big rock, so that the people could walk off to the rock and fish there. Another witness for the appellant states, that these stone piers, or jetties as he calls them, were not built by his father, who was the occupant of the upland, and he did not know who built them, or what they were built for; that one of them at least, which was not double, was used as the line fence between adjoining properties, and to keep the cattle from escaping. Other witnesses describe the jetties as water fences primarily designed to restrain the cattle, but, also, used to aid in the landing of boats, and for convenient fishing. These structures do not seem to have been claimed or used exclusively by any individual proprietor, but to have been open to public use. It is quite plain that in view of these conceded facts, there was no actual individual occupancy of the tract of land under water, or of any material portion of it, at the time of the delivery of the comptroller's deed, and that the deed then became completely operative as a grant by the state, without further proceedings on the part of the grantee. (*Smith* v. *Sanger*, 4 N. Y. 577; *Miller* v. *L. I. R.*

*R. Co.*, 71 id. 385; *Roberts* v. *Baumgarten*, 110 id. 385; *Roe* v. *Strong*, 107 id. 350; *McFarlane* v. *Kerr*, 10 Bosw. 249; *Drake* v. *Curtis*, 1 Cush. 411.) In *McFarlane* v. *Kerr*, the owner of the upland had continued his boundary fences to low-water mark, to prevent cattle passing around them, and had built a bulkhead and filled in with earth a small portion of the land between high and low-water mark, and had cut sedge thereon, and it was held that this was not such an occupation of the land, as would support a defense of adverse possession. Yet an adverse holding may be upheld in certain cases where there is only a constructive possession of part of the premises, but the statute under consideration requires an actual occupation, in order to impose upon the purchaser the obligation of serving notice upon the occupant.

*Smith* v. *Sanger* was a case of a tax sale, where the law in this respect was substantially the same as in the act of 1819, and where the rule of construction is more strict, and it was held that the clearing, fencing and cultivating for the purposes of husbandry of two and one-half square rods, was not such an actual occupation of a lot of two hundred and fifty acres, as required the service of the notice.

Here it is shown by the record that these stone jetties comprised but a few square rods in area out of a tract of one hundred and forty-five acres, and were not claimed or used as private property, and we think it would be a subversion of the purpose of the statute, and a disregard of its letter, as well as its intent, to hold that the land was actually occupied by any person in 1836.

*Fifth.* The appellant failed to establish the defense of adverse possession. Upon this branch of the case the evidence is not conflicting, nor is it of such a character that different conclusions of fact can be legitimately drawn from it. The appellant's grantor Carll, first went into possession about 1861, of a small portion of the upland bordering upon the shore a distance of one hundred feet, which was used for a ship yard, and had two structures in connection with it called marine railways, each ten or twelve feet wide, extending into

the water about two hundred feet, partly above and partly below high-water mark, and capable of hauling up a vessel of one hundred and fifty tons. In 1863, Carll procured through the commissioners of the land office a patent for two and $\frac{35}{100}$ acres of land under water, upon which the marine railway had been erected, and in 1865 built a wharf thirty by one hundred feet, at the foot of a street. No other structures were erected more than twenty years before this action was commenced, and those subsequently added need not be considered. Whether they were kept up or used continuously for twenty years does not clearly appear. The appellant testified that when he purchased in 1886, they had all rotted down and been washed away, and the existing improvements were all made by him. In any view it is evident that there was no permanent appropriation of the soil by Carll. The structures were of a temporary character, and designed simply to afford a means of access between the upland and the navigable waters of the sound, and a title in fee will never be implied from user, where an easement only will secure the privilege enjoyed. (*Roe* v. *Strong*, 107 N. Y. 350.)

The statute (Code, § 368) provides that in an action of ejectment, the person who establishes a legal title to the premises, is presumed to have been possessed thereof, within the time required by law, and the occupation of another is deemed to have been under, and in subordination to the legal title, and the burden is thus thrown upon the defendant to prove an actual, adverse and exclusive enjoyment of the property in fee, during the prescribed period.

From the nature of the property, it is difficult to show such a possession of lands under water as is required to support the presumption of a grant, and we fail to find any case where anything short of a permanent and exclusive occupation of the soil has been regarded as sufficient. (Buswell on Lim. & Ad. Poss. § 244; *McFarlane* v. *Kerr, supra.*)

The use which the appellant's grantor made of this property, for any continuous period of twenty years, is not shown to have been of such a kind as to necessarily require the impli-

cation of a grant in fee, to render it lawful, and it is, therefore, not available as a defense, when the owner of the legal title seeks to recover the fee.

*Sixth.* While the respondents have successfully maintained their title to the fee of the land under water, of which the appellant claims to be the owner, we think the judgment must be in one respect modified. What the state conveyed to Hunter was the property which the Crown granted to Palmer in 1763. That conveyance contained an important proviso to the effect that it should not extend or be construed to extend at any time thereafter, to prohibit or in any wise deprive, prejudice, exclude or hinder any person from any right, liberty or privilege, which he might lawfully have enjoyed if the grant had not been made, in bringing to and anchoring any ship, boat or vessel on the premises granted, or fishing on the same, nor from any other right, liberty or privilege he might have lawfully enjoyed, except upon such parts of the premises as shall at such time or times be covered with wharfs or other buildings erected thereon by the grantee, his heirs or assigns, and reserving to the sovereign, and to all other persons whatsoever at all times thereafter, all such powers, liberties, rights and privileges in every part of the premises not covered with wharfs and buildings, as fully as if the grant had not been made. While the fee was conveyed, yet there was reserved to the public and to the upland owners the right to use the premises for the purposes of fishing, navigation, anchorage and access to and from the island until wharfs and buildings had been erected thereon, and to so use all parts of the premises at any time, not occupied by such structures.

The property rights granted to Palmer were similar in terms to the grants of land under water by the commissioners of the land office, and contained similar reservations, which secure to the people the same measure of enjoyment of the premises conveyed as they were entitled to before the conveyance, until the land has been actually appropriated and applied to the purposes of commerce, or for the beneficial use of the owner, by the erection of docks and other structures thereon.

The deed to Hunter is expressly limited to the lands granted to Palmer and did not vest in him any rights which the Crown had reserved and which passed to the people as the successors of the royal power, and of which they did not become possessed by means of the forfeiture of the grant.

The judgment should, therefore, be modified by inserting therein the proviso and reservation contained in the patent to Palmer, and as thus modified affirmed, without costs to either party in this court.

All concur.

Judgment accordingly.