(163 App. Div. 401)

### In re MAIN STREET IN CITY OF NEW YORK.   (No. 6012.)

(Supreme Court, Appellate Division, First Department.   July 10, 1914.)

EMINENT DOMAIN (§ 147*)—INTEREST OF OWNER—NOMINAL DAMAGES.

Appellant held land at the foot of the main street of a village on an island in Long Island Sound, which extended from the sea wall, above high-water mark, out into the Sound, tracing title under a grant which recited that the grant was upon condition that the grantee should not build docks, wharves, or other structures so as to obstruct navigation, and that he should not prohibit any person from exercising any right or privilege which he might have lawfully enjoyed before the granting of the patent.   The purpose of the patent was to secure to the inhabitants of the municipality docking facilities without which the village could not exist.   *Held* that, where the public right to docks built upon appellant's land had been recognized for many years, and the dock was really a continuation of the main street, appellant was entitled only to nominal damages for the taking of her land for the extension of the street.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 394–396;  Dec. Dig. § 147.*]

Appeal from Special Term, New York County.

Application by the City of New York to acquire title to land for the opening and extending of Main Street (City Island) from City Island Bridge to Long Island Sound.   From an order overruling objections to a report of the Commissioners of Estimate and Assessment and confirming the report, Arabella D. Huntington appeals.   Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Tompkins McIlvaine, of New York City, for appellant.
James R. Fitzgerald, of New York City, for respondent.

DOWLING, J.   This is an appeal by Arabella D. Huntington from an order confirming the report of the commissioners of estimate and appraisal herein, in so far as it awards her nominal damages only for the parcels of land owned by her and numbered 222 and 222A on the Damage Map in this proceeding.   The property in question lies at the southerly end of City Island (formerly known as Miniford Island), and parcel 222 consists of upland, lying at the foot of Main street, between the sea wall and the high-water mark of Long Island Sound, while parcel 222A adjoins it and consists entirely of land under water.   Appellant's title, by mesne conveyances, is derived from a grant from the Crown of England, evidenced by a patent granted by Robert Monckton, captain general and commander in chief of the province of New York, to Benjamin Palmer, dated May 27, 1763, and duly recorded. This grant recites that David Hunt and 14 other designated persons

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

(including Palmer), with many more, styling themselves proprietors of Miniford's Island, in the county of Westchester, on behalf of themselves and their associates, to the number of 100, had presented a petition setting forth that they had caused the island to be surveyed and laid out as a town at their expense; but, in order to render the same uniform and add to its conveniences and comfort for future inhabitants, they had been under the necessity of introducing into the plan in many parts quantities of the soil under water "the obtaining of a grant whereof was highly essential to enable the said petitioners and their associates to effect a settlement thereof in any degree advantageous," wherefore they had prayed for a grant to Benjamin Palmer, his heirs and assigns, of "four hundred feet of the soil under the waters from common high-water mark into the Sound." Thereupon there is granted to Benjamin Palmer, his heirs and assigns, the land under water to the distance of 400 feet into the Sound from the "common high-water mark, together with all and singular the benefits, liberties, privileges, ways, waters, water courses, easements, wharves, keys, profits, hereditaments and appurtenances to the same, or any part thereof, belonging or in any way appertaining or that can in any wise thereat or therewith be had, made or used or enjoyed." This grant was upon certain conditions. The petition therefor, it is recited, had prayed that a clause should be inserted in the letters patent restraining Palmer, his heirs or assigns, "from docking or erecting wharves in any manner so as to obstruct or prejudice the navigation of the said Sound or any part thereof." The grant provided that if Palmer, or any other person by his consent, should thereafter erect or build wharves, docks, or other buildings on the land granted, "so as in any manner to obstruct, hurt or prejudice the navigation of the said Sound or East river, or to make the same at any time or times less commodious or safe for any ships or vessels whatsoever to pass or repass or be navigated in the said East river or Sound, that then our present grant shall cease and be absolutely null and void." Furthermore it was declared:

"That nothing in these presents contained shall extend or be construed to extend at any time or times hereafter to prohibit or in any wise deprive prejudice exclude or hinder any person or persons whatsoever from any right, liberty or privilege which he or they might lawfully enjoy before the granting these our letters patent in bringing to and anchoring any ship, boat or vessel on the premises hereby granted or fishing on the same nor from any other right, liberty or privilege which he or they might legally have enjoyed as aforesaid except, only, on such part or parts of the premises hereby granted as shall at such time or times be covered with wharves or other buildings erected thereon by the said Benjamin Palmer his heirs or assigns or some or one of them hereby reserving to use (sic) our heirs and successors and to all other persons whatsoever, at all times and times hereafter all the said powers, liberties, rights and privileges in every part of the premises hereby granted not covered with wharves or buildings as aforesaid as if this, our grant had not been made."

Accompanying the letters patent was a map made by Alexander Golden, surveyor general, dated May 5, 1763, and showing the extent of the grant wherein reference is made to "the Main street laid out the length of the said island." Upon it are delineated streets running north and south, as well as east and west, and all of said streets are unmis-

takably carried to the high-water mark from which the grant to Palmer is measured and its outer limits indicated.

In De Lancey v. Piepgras, 138 N. Y. 26, 33 N. E. 822, the Court of Appeals, in passing on the validity of the title acquired by Elias D. Hunter through his purchase of the estate granted by the Palmer patent under a sale by the state of New York for nonpayment of the annual quit rent, said:

"Sixth. While the respondents have successfully maintained their title to the fee of the land under water, of which the appellant claims to be the owner, we think the judgment must be in one respect modified. What the state conveyed to Hunter was the property which the crown granted to Palmer in 1763. That conveyance contained an important proviso to the effect that it should not extend or be construed to extend at any time thereafter to prohibit or in any wise deprive, prejudice, exclude, or hinder any person from any right, liberty, or privilege, which he might lawfully have enjoyed, if the grant had not been made, in bringing to and anchoring any ship, boat, or vessel, on the premises granted, or fishing on the same, nor any other right, liberty, or privilege he might have lawfully enjoyed, except upon such part of the premises as shall at such time or times be covered with wharves or other buildings erected thereon by the grantee, his heirs or assigns, and reserving to the sovereign and to all other persons whatsoever at all times thereafter, all such powers, liberties, rights, and privileges in every part of the premises not covered with wharves and buildings, as fully as if the grant had not been made. While the fee was conveyed, yet there was reserved to the public and to the upland owners the right to use the premises for the purpose of fishing, navigation, anchorage, and access to and from the island until wharves and buildings had been erected thereon, and to so use all parts of the premises at any time, not occupied by such structures." "The property rights granted to Palmer were similar in terms to the grants of land under water by the commissioners of the Land Office, and contained similar reservations, which secured to the people the same measure of enjoyment of the premises conveyed as they were entitled to before the conveyance, until the land has been actually appropriated and applied to the purpose of commerce, or for the beneficial use of the owner, by the erection of docks or other structures thereon. The deed to Hunter is expressly limited to the lands granted to Palmer and did not vest in him any rights which the crown had reserved and which passed to the people as the successors of the royal power, and of which they did not become possessed by means of the forfeiture of the grant."

It would thus appear, from the construction of the grant to Palmer and its accompanying map, that not only was it planned to carry the highways of the island to at least high-water mark, but that the main purpose of that grant was to advantage the settlers on the island, to enable them to obtain direct access to the navigable waters of the Sound, as well as rights in and over the 400 feet granted, for their common enjoyment. Without these rights their settlement could not prosper or exist, for their sole communication with the mainland must be by water, and in that way alone could they receive supplies or engage in trade or commerce.

In 1844 or 1845 a stone dock was built at the southerly end of Main street, extending out into the Sound, by Stephen J. Horton, who then owned the southerly end of the island. This dock was built of stone, "filled in solid with small stones." It started at high-water mark and connected with Main street, which at that time went out "right down to the water," so that it made a continuous highway. On the dock a storehouse was built, and the inhabitants of the island landed their coal

there. As there was no way of getting to New York, Horton volunteered to build the dock, hired some men to help him, and some of the residents assisted in the work. "The dock was at the end of the street," one witness describes it, and every one on the island who desired used it without payment or any charges whatever. This would appear to have been precisely such a use of the surrounding waters as the Palmer grant contemplated. The dock remained there until a period variously fixed by witnesses as 1878 and 1889, when it was taken down by Belden, the then owner of the southerly end of the island. In 1900 the present wooden dock was erected by the city of New York, extending from the end of Main street out into the waters of the Sound, and over the plaintiff's property to a point 350 feet from high-water mark. This dock is 30 feet in width, corresponding with the former width of Main street, except at the outermost part, where it is 80 feet wide. It follows the lines of Main street, and is physically a continuation thereof. There is no evidence as to the precise period of time when Main street was laid out, but concededly it has been a public highway "time out of mind." A glance at the maps in evidence shows it at once the natural roadway, north and south, through the island. We think upon the record that it was always the purpose and object of the Palmer grant to insure for the inhabitants of the island access to the navigable waters surrounding it; that the highways of the island were intended to be carried down to navigable water and the grant was subject to such public use; that the carrying of Main street to the water line was in pursuance of such intention; that when a dock was built at the foot of Main street and connected therewith it formed an extension to Main street and dedicated to the public the right to pass out and over the same as part of the highway to navigable water; and that the new dock fulfills the same purpose and is in harmony with the same end of serving the public convenience contemplated by the original grant, by giving to the inhabitants free access to the navigable waters. We are of the opinion therefore that the commission, in view of all the circumstances, were correct in their award of only nominal damages to the appellant for the two parcels in question. As to what right she may have to wharfage and cranage we express no opinion; the question not being before us.

The order appealed from will be affirmed, with costs. All concur.